BÁIRD MITCHELL AND JOHN O. TUCKER,

co-partners trading as

MITCHELL, TUCKER & COMPANY,

*vs.*

HIGHLAND-WESTERN GLASS COMPANY, a corporation duly organized and existing under the laws of the State of Delaware.

*New Castle, June* 21, 1933.

*Arthur G. Logan,* of the firm of Marvel, Morford, Ward & Logan, for complainants.

*Ivan Culbertson, (Hugh M. Morris,* on the brief), for defendant.

THE CHANCELLOR: The defendant was incorporated under the *General Corporation Law* of this State. The sale here under attack was made in pursuance of the power conferred by *Section* 64 *(A)* of that act (*Revised Code* 1915, § 1978A, as added by 29 *Del. Laws, c.* 113, § 17, as amended by 36 *Del. Laws, c.* 135, § 19). No contention is made to the effect that the provisions of the section were in anywise departed.from. The fact that the consideration paid for the defendant's assets consisted of shares of stock of the purchasing company can of course supply no objection to the sale. The section authorizing the sale is explicit to the effect that consideration of that kind may be lawfully accepted. Whether, however, the disposition of the shares·received in consideration which the bill alleges the defendant proposes to make of them and which the directors appear to have resolved upon, is permissible under the charter provisions of the defendant, is a question which, though discussed by the solicitor for the complainants, is not one which the bill presents for decision. I therefore express no opinion upon it.

The case made by the bill, both in its original and amended form, and denied by the answers, is, in its main feature, that the consideration received by the defendant

for the assets sold is so grossly inadequate and therefore unfair as to constitute a fraud in law upon the objecting minority stockholders, who appear to be only the complainants. Their holdings constitute two hundred and eighty-eight shares of the defendant's first preferred stock (twenty thousand shares outstanding), seventy-five shares of the defendant's second preferred stock (six thousand shares outstanding) and three hundred shares of the defendant's common stock (twenty thousand shares outstanding).

In addition to the main feature of the case just mentioned, the complainants rest their attack upon two other considerations which will be first noted and disposed of before the main one is taken up for consideration.

These are first, that the officers and directors who negotiated the sale and who with their relatives control a majority of the stock of the defendant, have used their power to commit the defendant to the sale in order to give themselves a personal advantage and profit, and that therefore the transaction is vitiated by a fraud. The only evidence offered to support this charge is that three of the vice-presidents of the defendant have become directors and vice-presidents of the purchasing company. That they were to become directors of the purchasing company was pre-arranged. But certainly that is a circumstance of no objectional import. Why should not the selling interests have insisted that, in view of the large stock ownership which the selling corporation was to acquire in the purchaser, the former should have representation on the latter's directorate? Business prudence would suggest that it should be so and practice in such matters almost uniformly follows the suggestions of prudence. There is no profit in the office of director. That the three gentlemen in question should also become vice-presidents of the purchasing corporation was not pre-arranged and made a condition of the sale. They, however, have become vice-presidents

of the purchaser since the sale was effected, and as such they are in active charge of certain branches of the purchaser's activities and are paid salaries. The salaries they receive are the same as they had formerly received as officers of the defendant. Whom, if any one, in the purchaser's organization they replaced, is not shown. No contention is made, as none could be made in view of the evidence, that anything by way of so-called advantage flowed to these three individuals as a result of the sale, other than what has just been stated, which marks them apart as particularly favored over any other stockholder. Such a so-called advantage is hardly worth the name. It would be a strange doctrine to assert that a sale of corporate assets is to be condemned as fraudulent on the bare showing that two or three responsible and presumably capable officers of the seller were, after the sale, engaged to render services for the purchaser similar to the services theretofore rendered by them to the seller at the same compensation which they had formerly received and which, so far as appears, was reasonable and therefore fair.

The second consideration above referred to is, that the officers and directors made no such examination of the purchaser's affairs and assets as enabled them to judge of the value of the purchaser's stock which was to compose the consideration, and that therefore the stockholders have not had the benefit of the informed judgment of the directors that the terms of the sale are deemed by them to be "expedient and for the best interests of the corporation," as the statute in *Section* 64(*A*) contemplates. There was no physical valuation of the assets of either the purchaser or the seller. The solicitor for the complainant insists that the directors of the defendant based their recommendation of the sale solely on one balance sheet of the purchaser submitted by it. I am at a loss to understand why that insistence is made, because the evidence is very clear to the effect that the books of the Mississippi

Glass Company, the purchaser, had been fully opened up to the defendant and its affairs exposed to the inspection of the defendant's directors. This was on the occasion when prior negotiations for a sale were undertaken which were later abandoned because of inability of the parties to agree on terms. The final sale terms were predicated on the books of the two companies, each relying on the integrity of the other's books. Nothing has been produced to show that the reliance was misplaced by either party. I can find no justification in the evidence for concluding that the defendant's directors acted so far without information that they can be said to have passed an unintelligent and unadvised judgment.

I now take up the main ground on which the complainants rely as showing the sale to be a fraud in law upon them as non-assenting stockholders. This ground is that the fifty-three thousand shares of the Mississippi Glass Company, the purchaser, are so grossly inadequate as a consideration for the defendant's assets as to constitute a fraud. *Robinson v. Pittsburgh Oil Refining Corp.*, 14 *Del. Ch.* 193, 126 *A.* 46, and *Allied Chemical & Dye Corp. v. Steel & Tube Co. of America*, 14 *Del. Ch.* 1, 120 *A.* 486, announce all the principles of law which are necessary for consideration in considering this ground of objection. In *Robinson v. Pittsburgh Oil Refining Corp.*, the rule was laid down that a sale of the present sort must be examined with the presumption in its favor that the directors who negotiated it honestly believed that they were securing terms and conditions which were expedient and for the corporation's best interests. Nothing appears in this case to rebut that presumption unless it be that the consideration received was so grossly inadequate as to indicate a legal fraud. As held in the case of *Allied Chemical & Dye Corp. v. Steel & Tube Co., supra,* the directors and majority of stockholders who resolve on a sale owe the duty of obtaining a fair and adequate price for the assets;

but a mere inadequacy of price will not suffice to condemn the transaction as fraudulent, unless the inadequacy is so gross as to display itself as a badge of fraud.

Now in this case, when we come to examine the consideration received as the price for the assets, I am left in no doubt as to its fairness. The selling and the purchasing corporations were both in the rolled glass business—a business that is afflicted with a high potentiality of overproduction due to plant extensions and the introduction of improved processes which the prosperous period of a few years ago had encouraged. When the depression came in 1929 the rolled glass business suffered severely in general, and these two companies in particular turned from a condition of satisfactory earnings to one of alarming losses. They were active competitors. They also were in controversy over important patent rights which are of very substantial importance to successful operation in the rolled glass industry. The defendant's officers conceived the idea of putting the two businesses together. This appeared desirable for reasons that I shall not burden this memorandum with stating. The negotiations originated by the defendant failed of result. Later the Mississippi Glass Company took the initiative in renewing them and the sale here in question was the result. By its terms all the assets of the defendant are acquired by the Mississippi Glass Company, with an assumption of debts, and the defendant receives therefor fifty-three thousand shares of the purchaser's class B stock. The assets of the two companies are thus thrown into a common pool, and the parties to the arrangement hold all the common assets, as a result of the sale, in the ratio of two to one—that is to say Mississippi Glass Company's stockholders hold stock in twice the number of shares held by the Highland-Western stockholders. (It does not seem to me to be necessary to discuss the preference given to the stock held by the Mississippi Glass stockholders, because those preferences have no relation whatever to the rolled glass end of the

Mississippi Glass Company's business; they are preferences which merely constitute the mechanics whereby the clay block and clay business of the Mississippi Glass Company was segregated from its glass business. All that was pooled by the two companies was their respective rolled glass businesses, and as to them the stock received by the one and retained by the other are on the same footing.)

This two to one ratio was arrived at on the supposition that the net assets of the Mississippi Glass Company had a value approximately twice as great as the net assets of the Highland-Western Glass Company. The books of the two companies as reflected on their respective balance sheets were consulted for arriving at the values. As a matter of fact the net assets of the Mississippi Glass Company appear to be greater than two to one and, if so, the adopted ratio favors the Highland-Western stockholders.

The solicitor for the complainants argues strenuously for the contention that according to the balance sheets the Highland-Western Glass Company's net assets, instead of being only one-half those of the Mississippi Glass Company's net assets, are close to being equal thereto and that therefore the adopted ratio is grossly unfair. I have attentively examined the argument thus made by the solicitor for the complainants and find myself totally unable to accept it. Without attempting to examine all the details of his argument, I think it advisable to select some of the more conspicuous fallacies with which it seems to abound. For instance the opening sentence of the complainants' brief states that the assets of the defendant had a value of two million dollars, whereas the stock acquired therefor has a fair market value of only three hundred and eighteen thousand dollars. If the relative dollar values stood in that proportion, the sale would be a highly sacrificial one. But how does the solicitor arrive at those figures? He does it in this way—he takes the full book value of the selling defendant's assets as their fair value, but refuses to value

the stock received in exchange therefor by calculating its proportionate ownership of the purchaser's assets as shown by its books. He thus applies the book value formula to the seller's assets and refuses to apply it to the purchaser's assets. Manifestly that is unjustifiable. Further, he deducts from the purchaser's assets the item of good-will, but leaves the seller's good-will item among its assets. He assails the purchaser's business as now running into annual losses, and ignores the loss into which the seller's business was running before the sale at the rate of from two hundred and sixteen thousand dollars to two hundred and forty thousand dollars per year. He insists on deducting the full value of one hundred and twenty-five thousand dollars from the assets of the purchaser because a plant carried as worth that amount had shut down. If that be a sound principle of valuation, then all the plants of the two companies are worth zero, because I understand they are all shut down. He insists upon adding an item of thirty-seven thousand dollars to the assets of the seller which is plainly not an asset. It is an amount which, in case profits should be earned, is deductible from taxable income under the internal revenue bureau regulations. He insists further upon adding to the seller's assets an item of over ninety-nine thousand dollars which represents a depreciation taken in 1931 on the book value of land, buildings, etc., as shown in the statement of the year before. There is no evidence to justify the thought that the depreciation was unwarranted. At the same time it is assumed by the complainants, without evidence to support the assumption, that the purchaser's fixed assets were not correspondingly depreciated.

The foregoing are some of what appear to me to be the fallacies in the complainants' argument by which they seek first to establish and then to magnify an alleged disparity between what the seller gave and what it received. I shall not take the time to examine further into the details

which the arguments on both sides have developed. I must content myself with the statement of my conclusion which is, that after going through and maturely considering all the evidence and carefully considering the views of the solicitors which are fully developed on their briefs, I am of the opinion that nothing is shown which would warrant any such interference by this court as is prayed for in the bill as amended.

A decree dismissing the bill will therefore be entered.