ROBERT D. STERLING, et al.,

*vs.*

MAYFLOWER HOTEL CORPORATION and HILTON HOTELS CORPORATION, corporations of the State of Delaware.

*New Castle, June 17, 1952.*

*S. Samuel Arsht* and *George T. Coulson*, of Morris, Steel, Nichols & Arsht, and *Stephen. S. Bernstein*, of Chicago, of Mc-Laughlin & Stern, for plaintiffs.

*Aaron Finger*, of Richards, Layton & Finger, and *William J. Friedman*, of Chicago, Ill., for defendant Mayflower Hotel Corp.

*William S. Potter*, of Berl, Potter & Anderson, and *Claude A. Roth*, Chicago, Ill., for defendant Hilton Hotels Corp.

SEITZ, Chancellor: Plaintiffs seek a preliminary injunction restraining the consummation of an agreement of merger between defendant corporations. They assert that the merger plan was not approved by a quorum of disinterested directors and that the terms of the agreement are both fraudulent and unfair to the so-called minority stockholders of the corporation to be merged.

Plaintiffs are certain minority stockholders of the defendant Mayflower Hotel Corporation (hereafter called "Mayflower"). At a directors' meeting held March 6, 1952, Mayflower's directors approved a plan whereby Mayflower was to be merged into Hilton Hotels Corporation (hereafter called "Hilton"). Similar action was taken by Hilton's board of directors. Under the terms of the merger each holder of Mayflower stock is to receive one share of Hilton stock for each share of Mayflower. The Hilton stock presently outstanding is to remain outstanding and is unaffected except by reason of the issuance of shares to the Mayflower stockholders.

On April 14, 1952, pursuant to notice of March 24, 1952, the Mayflower stockholders met and voted to approve the merger. At the time of the meeting Hilton owned 83% of the Mayflower's stock. Thus the vote was 329,106 shares for the merger and 4,645 shares against. Holders of 35,191 shares who objected in writing to the plan did not vote at the meeting. The Hilton stockholders overwhelmingly approved the merger.

Although not a part of the agreement of merger, Hilton has agreed with Mayflower that for a period of thirty days after the consummation of the merger, Hilton will purchase from the Mayflower's stockholders, at $19.10 per share, the shares of Hilton received by them in the merger.

It is necessary to detail the facts at some length in order to present the issues to be decided.

Mayflower and Hilton are both Delaware corporations. The sole business of Mayflower is the ownership and operation of the Mayflower Hotel in Washington, D. C. Hilton's business is the owning, leasing, operating and managing of hotels either directly or through subsidiaries.

Mayflower's capitalization consists of 389,738 shares of common stock issued and outstanding. Hilton has issued and outstanding 6,701 shares of convertible preference stock of a par value of $50, and 1,592,878 shares of common stock with a $5 par.

Hilton acquired more than 50% of Mayflower's outstanding shares on December 18, 1946. Subsequently, it purchased additional shares of Mayflower and has been actively soliciting Mayflower

stockholders to sell their shares to Hilton. As of March 25, 1952 Hilton owned 321,883 shares or 82.51% of Mayflower's outstanding shares. Hilton's recent offering price has been $19.10 per share and it has been able to purchase a substantial number of shares at that price.

There has been much discussion by counsel concerning Mayflower's board, but there can be no doubt that all of its directors are persons who were elected and selected with the approval of the defendant Hilton. Of course, it does not follow therefrom that these men of substantial reputation failed to discharge their legal obligation to all of Mayflower's stockholders. Actually that is one of the questions for decision.

Plaintiffs assert that no quorum was present at the meeting of Mayflower's board at the time the agreement of merger was approved because admittedly there was no quorum of disinterested directors. They contend that Article Thirteenth of Mayflower's certificate of incorporation authorizing the counting of interested directors for quorum purposes is illegal. They say such a certificate provision violates *Paragraph 8 of Section 5* of the *General Corporation Law, Rev.Code* 1935, § 2037, *subd.* 8, which provides that no certificate provision may be inserted which is "contrary to the laws of this State."

Plaintiffs argue that in any event Hilton, as the controlling stockholder of Mayflower, is a fiduciary for the so-called minority stockholders of Mayflower and that as such it has the burden of affirmatively demonstrating that the proposed merger is just and fair to all of Mayflower's stockholders and that Hilton will derive no unfair advantage. Plaintiffs assert that the plan is both fraudulent and unfair to the minority stockholders of Mayflower.

Defendants concede at the outset that because of Hilton's dominant stock ownership in Mayflower, they are fiduciaries in the sense that they have the burden of showing that the terms of the proposed merger are entirely fair to all Mayflower stockholders. Defendants assert that the elaborate affidavits and depositions show overwhelmingly that the terms of the merger are fair and that there is no reasonable probability of the plaintiffs' prevailing on final hearing.

Plaintiffs contend that no quorum of disinterested directors was present at the meeting of the Mayflower board at which the agreement of merger was approved for submission to its stockholders. This being so, plaintiffs contend that the agreement was not approved by Mayflower's directors at a lawfully constituted meeting and was, therefore, not approved and adopted in accordance with the procedural requirements of the Delaware Corporation Law.

Plaintiffs concede that if Article Thirteenth[1] of Mayflower's certificate of incorporation is valid, a legal quorum was present because that article authorizes the counting of interested directors for quorum purposes.

The plaintiffs contend that Article Thirteenth is invalid because they say it was inserted in violation of *Section 5, Paragraph 8* of the *General Corporation Law* which permits the insertion of provisions which are not contrary to the law of this State. Plaintiffs say this provision is contrary to the common law rule of this State which precludes the counting of interested directors for purposes of determining the existence of a quorum. See *Blish v. Thompson Automatic Arms Corp.*, 30 *Del.Ch.* 538, 64 *A.2d* 581.

It seems to be conceded that there was no quorum unless at least some of the interested directors were counted. Further, I shall assume without deciding that the approval of the plan by the stockholders did not remove the necessity for prior affirmative action by a legally constituted quorum of directors.

It is clear that the certificate provision here involved does not violate any explicit statutory provision but it seems fair to

---

[1] "Thirteenth: In the absence of fraud, no contract or other transaction between this Corporation and any other corporation or any partnership or association shall be affected or invalidated by the fact that any director or officer of this Corporation is pecuniarily or otherwise interested in or is a director, member, or officer of such other corporation or of such firm, association or partnership or is a party to or is pecuniarily or otherwise interested in such contract or other transaction or in any way connected with any person or persons, firm, association, partnership or corporation pecuniarily or otherwise interested therein; any director may be counted in determining the existence of a quorum at any meeting of the Board of Directors of this Corporation for the purpose of authorizing any such contract or transaction with like force and effect as if he were not so interested or were not a director, member or officer of such other corporation, firm, association or partnership; * * *."

construe "law" as used in *Section 5, Paragraph* 8 to embrace common law principles. See *State v. Penn-Beaver Oil Co.*, 4 *W.W. Harr.* 81, 143 *A.* 257; compare *Piccard v. Sperry Corp., (D.C.)*, 48 *F.Supp.* 465; affirmed (2 *Cir.*), 152 *F.2d* 462.

The question, therefore, comes down to this: Is the Delaware common law rule which precludes the counting of interested directors for quorum purposes of such a nature that the stockholders may not contract to the contrary at least in situations where the action taken must be submitted for stockholder approval?

There is a remarkable lack of authority on this problem. I have found no Delaware cases on this point. *State v. Penn-Beaver Oil Co., supra.*, deals with the complete abolition in the certificate of incorporation of the common law right of the stockholder to see the corporate books and records. In that case the provision was held not to be warranted by *Section 5, Paragraph* 8 of the law because of the absolute nature of the prohibition. However, a provision similar to that here involved was considered in *Piccard v. Sperry Corp., supra.* The validity of such a provision was upheld. However it must be said that the federal court did not discuss the merits of the matter, rather it relied upon the absence of Delaware authority, and other general considerations.

The basis for the common law rule is the prevention of conflict between duty and self-interest or divided interest. See *Italo-Petroleum Corp. v. Hannigan*, 1 *Terry* 534, 14 *A.2d* 401. However, there are many cases where there is such a conflict and the court deals with it as here, by placing the good faith and fairness burden on those espousing the transaction. Assuming, as I have here done, that action by a quorum of directors is necessary, it would seem unrealistic to say that no action could be taken because of the. inability to procure a disinterested quorum. To adopt a rule having that effect, particularly where stockholder approval is also necessary, is merely to invite subterfuge and encourage the election of so-called dummy directors.

I conclude that at least to the extent Article Thirteenth permits the counting of interested directors for quorum purposes in

order to take action prerequisite to the submission of a matter for stockholder approval, it is lawful. The common law rule here altered by stockholder agreement is not of such a character that it may not be so altered. Compare *Martin Foundation v. North American Rayon*, 31 *Del.Ch.* 195, 68 *A.2d* 313. It follows that Article Thirteenth does not in this case violate *Section 5, Paragraph* 8 of the *General Corporation Law*. Plaintiffs' contention that the action of the Mayflower directors was invalid for lack of a legal quorum is without merit.

I next consider plaintiffs' charge that the plan is fraudulent and unfair. It is all too apparent that the court is required to examine and compare certain value factors in order to resolve plaintiffs' contentions. Plaintiffs allege, and defendants do not seem to seriously dispute, that the going concern value of Mayflower were it up for a public sale would amount to $10,000,000 or more. Plaintiffs assert that in order to ascertain fairness this figure should and must be compared only with the market value of Hilton stock to be received ($5,846,070); there admittedly being a freely-traded uninfluenced market for Hilton stock but not for Mayflower stock. Plaintiffs say this is the proper comparison test because the Hilton market price is conclusive of the value of the consideration to be received by the Mayflower stockholders.

Is the market value of Hilton stock the sole value factor to be considered in making the comparison with the value of the Mayflower property? It seems to me that *Cole v. National Cash Credit Ass'n.*, 18 *Del.Ch.* 47, 156 *A.* 183, by necessary implication decides that in a merger case all relevant value factors must be considered in arriving at a fair value for comparison purposes. In the *Cole* case the Chancellor so stated and, indeed, indulged in a lengthy examination of various value factors to see what was the fair value of the assets in each corporation. One important difference in principle between the *Cole* case and the present one is that in that case the defendants had the benefit of a good faith presumption while here the defendants have the burden of showing their good faith and the fairness of the transaction. A similar approach was taken in *Porges v. Vadsco Sales Corp.*, 27 *Del.Ch.* 127, 32 *A.2d* 148; see also *Mitchell v. Highland-Western Glass Co.*,

19 *Del.Ch.* 326, 167 *A.* 831. The question of the market value of the surviving corporation stock was admittedly not discussed in these cases but I do not believe the existence of a "free" market would have altered the approach.

■ I pause to emphasize that we are here dealing with a merger under the Delaware statute. While this court in *Cole v. National Cash Credit Ass'n., supra,* noted that a merger in substance involves a sale of assets, such assets are not to be valued as on liquidation. See *Porges v. Vadsco Sales Corp., supra.*

■ I conclude that all relevant value figures of both corporations may be examined and compared in order to arrive at a decision as to the fairness of the plan. Thus, while not determinative, nevertheless, the value of each corporation for various purposes, e. g., going concern value, book value, net asset value, market value, is pertinent to the issue presented.

I first consider the course of events leading up to the vote by the directors of Hilton and Mayflower to approve the plan of merger. As indicated, Hilton obtained the controlling stock of Mayflower in 1946 and continued to buy stock until it possessed about 83% thereof in March of 1952. From the time that Hilton first acquired the majority stock interest it intended to acquire the Mayflower Hotel property and to integrate it with Hilton's other assets.

In early 1950 Standard Research Consultants, Inc. (hereafter called "Standard"), was employed by Hilton to develop a fair plan of exchange of the common stocks of Hilton and Mayflower. Standard is a nationally known reputable firm having no interest in either Hilton or Mayflower. It took the assignment on the express condition that it would be permitted to exercise its own independent and unbiased judgment as to a fair plan of exchange. A report was rendered by Mr. Haslam, of Standard, in April of 1950 recommending the exchange upon the basis of ¾ of a share of Hilton for one share of Mayflower. After the lapse of time due to pending litigation, Standard was retained again on December 10, 1951 to bring the earlier report down to date. This report dated January 19, 1952 recommended the present share for share plan.

It forms the defendants' principal justification for the action taken and here under attack.

I have examined the very elaborate study prepared and submitted in support of its recommendation. In order to demonstrate Standard's approach I quote at some length from its study:

"In making our analysis of the Hilton Hotels Corporation and the Mayflower Hotel Corporation, we took into consideration such factors as the historical background and financial position of both companies, their net worth, and their operations and income on an overall and departmental basis. We also reviewed the record of market quotations on both common stock issues. The common stock of the Hilton Hotels Corporations has been listed and traded on the New York Stock Exchange since June 23, 1947, while the common stock of the Mayflower Hotel Corporation is quoted in the over-the-counter market.

We approached the problem of determining a fair basis of exchange of Hilton Hotels Corporation common stock for the minority interest common stock of Mayflower Hotel Corporation from the investor's point of view. On this basis, the problem boiled down to a comparison of the operating trends of each of the corporations and of the investment characteristics of the two stock issues.

In our original study, we made comparisons of the trend of gross revenues and gross operating profit over the ten-year period, 1940–1949. In this study, we have brought the figures up-to-date by including operations for the year 1950, and for the 11 months ended November 30, 1951.

"With respect to investment characteristics of the stocks, we first made a comparison of book values per share, as of the latest available balance sheet as of November 30, 1951. Next, a comparison of earnings per share was made on the following bases: (1) over the period, 1940–November 30, 1951, inclusive, both before and after income taxes, (2) over the postwar period, 1947–November 30, 1951, inclusive, and (3) for the 11 months ended November 30, 1951, only. A dividend comparison was then made over the years, 1947–1951, inclusive, and finally, we made a comparison of market values of both common stock issues, the latter being made over the period, 1947–1951, the year 1951 alone, and the approximate current market prices."

The Haslam report made no valuation of either the Hilton or the Mayflower stock or the physical assets as such. While they would have been relevant, the value factors compared appear to be sufficient for fair comparison purposes.

The later Haslam report was given to each of the Mayflower directors at the meeting of March 6, 1952. All of the Mayflower directors, except Hilton and Herndon, stated that they relied

entirely on the Haslam report as the basis for their opinions that the exchange was fair to Mayflower stockholders. Hilton and Herndon also relied on a great amount of other information known to them.

The Standard comparisons of the book values, earning values and dividend values of the common stocks of Mayflower and Hilton as of the date of the study, which included material up to November 30, 1951, showed that the Hilton stock possessed a greater per share value in all of those categories than did the Mayflower stock. The per share market value at the crucial date favored Mayflower by $1.75 under the Standard plan, but by $4.35 under the Hilton offer. However, as appears hereafter, there was no "true" market value for Mayflower stock.

Plaintiffs say that the directors, with two exceptions, relied almost exclusively upon the Standard report. Plaintiffs insist that the elements compared therein are in each instance erroneous in favor of Hilton, thus undermining the basis for the action by the directors.

Let us first consider the market value of the stocks. Hilton's common stock is listed and traded on the New York Stock Exchange. Its closing quotation on April 4, 1952 was 15-1/8. Its price on April 28, 1952 was 14-7/8. For the twelve months preceding April 1, 1952 it sold between a low of 12-7/8 and a high of 15-3/8. It is conceded that the stock was freely traded and that an uninfluenced market existed. However, defendants say the market value does not reflect the true value for purposes of comparison with Mayflower. I am inclined to agree in view of all the evidence up to date.

Mayflower's stock is not listed on any exchange. It has been traded over-the-counter. However, the sales have been small and the market very thin. The depositions of witnesses who of necessity seek to sustain the propriety of the merger show that the bid quotations for Mayflower stock came to about $17.25 per share during the period in question. This is apart from the fact that Hilton was buying Mayflower stock at $19.10 per share.

Leaving aside for a moment the $19.10 offer of Hilton, it serves

no substantial purpose to compare the market values of Hilton and Mayflower stock. I say this because it would be comparing a real market value for Hilton with a fictitious market value for May-flower. Both sides so concede. Standard's report contains such a comparison but I believe it should, as a comparison, be accorded little if any weight.

One of the difficult points in the case is plaintiffs' contention that Hilton by offering to buy Mayflower stock at $19.10 earlier this year has demonstrated that its per share value is more than the value of the Hilton stock which was selling for about $15 per share. Since defendants have the fairness burden, this requires careful consideration. What is Hilton's explanation? It is said that the $19.10 offering price for Mayflower stock has no necessary relation to actual values for comparison purposes because it was the price at which Hilton purchased a large block of Mayflower minority stock from one individual as the result of individual negotiations in late 1951. It was purchased from an individual who had given the management some difficulties. Hilton felt that a similar offer had to be made to the other stockholders. Moreover, it may be fairly inferred that Hilton sought to "buy" peace with the minority stockholders of Mayflower who had carried on protracted and expensive litigation with the management.

I conclude from the present record that this $19.10 value is relevant to the value comparison but by no means conclusive because it reflects factors not necessarily relevant to this comparison of the values of the respective stocks for present purposes. I speak of the desire to buy a large block and a desire to buy peace. Moreover, it is fair to infer that the demand for the relatively small number of outstanding shares created an artificial price. What view the stockholders of Hilton might take of such a cash offer is not an issue here. I conclude that the $19.10 offer standing alone does not render the plan unfair.

Plaintiffs make much of the fact that Hilton, contemporaneously with the plan, has offered to purchase at $19.10 per share the Hilton stock received by the Mayflower stockholders under the plan. Note that this is for Hilton stock. They say it coerces them to sell their stock because Hilton is selling on the

market for about $15. But what injury does this do to the Mayflower stockholders? If the plan of exchange is fair they are receiving a possible benefit depending upon their tax situation. The offer is somewhat unusual but the history of the relationships here involved render the explanation reasonable. It is not suggested that the exchange may not take place if it is fair to all Mayflower stockholders.

I conclude that the so-called market price factor when considered with the other factors mentioned, does not render the plan unfair.

Plaintiffs next attack the Standard report as to the per share book value ascribed to Mayflower. Plaintiff says that Standard used $14.38 per share as the book value of Mayflower's stock, yet they say Mr. Herndon, vice president and treasurer of both corporations, testified that it amounted to $17.50 per share. While not dispositive of this criticism, it may be noted that even accepting plaintiffs' contentions as to the proper book value of the Mayflower's stock, nevertheless it is still lower than Hilton's per share book value. Moreover, book value, especially here, is of little aid in determining the fairness of the exchange. I say this because the figure has little relation to value for any purpose here relevant. Additionally, the testimony shows that Mr. Herndon was there talking about book value for income tax purposes. The lower book value used by Standard was admittedly the value set in the 1935 reorganization. The footnotes in the proxy statement seem to me to be sufficiently informative in the premises. I conclude that plaintiffs' indicated attack on book value is without merit.

Plaintiffs point out that Standard took as the most recent market price for Mayflower stock the sum of $15.75 per share notwithstanding that Hilton had in December 1951 negotiated to buy a substantial block of Mayflower stock at $19.50 a share and on February 4, 1952 made a written offer to all of Mayflower stockholders to buy their shares at $19.10 per share ($19.50 less a $.40 dividend).

Plaintiffs contend that the failure of Hilton officers to bring to Mr. Haslam's attention the aforementioned alleged serious

discrepancies in the book value and the market price is inexcusable and can only be regarded as a deliberate effort on their part to favor Hilton as against Mayflower. Plaintiffs point to certain matters as to which Hilton officials called Standard's attention when they received the preliminary draft and yet failed to call the aforementioned discrepancies to its attention. These contentions seem to me to be without substantial merit. There was no failure to disclose as to book value. The lack of knowledge of Haslam concerning the $19.10 Hilton offer does not appear to be important because it was a matter of public knowledge and there is no reason to believe that it was deliberately withheld from Haslam. Haslam testified it would not have changed his conclusion. Certainly it was known to Mayflower's directors at the time they approved the plan. Moreover, it was a blanket offer to all Mayflower stockholders and is clearly set forth in the proxy statement sent to stockholders.

I conclude that there is no reasonable probability of showing at final hearing a deliberate non-disclosure of material facts.

Plaintiffs next argue that the earnings of Mayflower are improperly reduced by (1) failure to delete from Mayflower's 1950 income a $70,000 non-recurring expense for legal fees although the item purports to eliminate all non-recurring expenses, and by (2) charging capital improvement items to expense. By a spot check, plaintiffs say items aggregating some $41,000 are charged to income but should have been capitalized.

Considering first the $70,000 item for legal fees, it is not clear how it should have been treated in this case. In any event, it appears that its exclusion would only add $.08 per share to the earnings of Mayflower after taxes for 1950. This still makes Mayflower's 1950 income per share substantially less than Hilton's. Moreover, casting of some doubt on the propriety of the treatment of this accounting item does not alter the result when matters are kept in proper perspective.

Plaintiffs charge that a test check shows that $41,000 or more was charged to Mayflower expense rather than capital improvements in 1951, thus falsely inflating expenses and thereby reducing net earnings. Once again, if this adjustment should be made it would add about $.04 per share to the 1951 earnings of May-

flower after taxes which still leaves the figure about $1.20 per share below Hilton's earnings for the same year. Moreover, a most arbitrary basis is often used to determine whether an item is ordinary expense or a capital item. It does not appear that the Mayflower's officials acted in bad faith in this respect.

■ Plaintiffs point to the $512,000 item arising from retirement of Hilton debentures in 1950 and say that the inclusion thereof falsely inflates Hilton's income because it is non-recurring. The answer is that it was not included in the per share earnings but was transferred directly to surplus. Thus the earnings for 1950 for Hilton as they appear in the proxy statement and the Standard report are not affected by the debenture retirement item. A similar item for 1951 is so small in the overall picture as not to require comment.

■ Plaintiffs next argue that the per share value of Mayflower stock would amount to about $26.75 were the property sold. They say that even if it should be compared with the Hilton assets on a similar value basis, and they deny that it should, nevertheless, the defendants must lose at the preliminary injunction stage because their papers fail to reveal a per share value on a comparable basis. It is conceded that the Hilton assets were not physically appraised but we do have reliable statements as to the value of Hilton's two principal assets on a fairly comparable basis. They are reliable because they are made by at least two men (Hilton and Herndon) who know the properties, know the business and have substantial statistical support for their conclusions. Of course, their testimony and affidavits are not conclusive but they are entitled to real weight when not effectively challenged.

It does not seem unreasonable to conclude from the affidavits and depositions that Mayflower had a fair market value and reproduction value at the time here pertinent of upwards of $10,000,000. Conceding that the tax problem in connection with a sale would reduce the amount received, nevertheless, at that price plaintiffs contend that the corporation might have received money equivalent to $26.75 per share. Defendants appear to admit that after taxes it would be equivalent to $24.67 per share.

While the Hilton assets were not physically appraised for sale

purposes, nevertheless, a conservative capitalization of earnings of Hilton's principal assets (Conrad Hilton and Palmer House) shows them to have a fair going concern value of $60,000,000, which is contrasted with a book value of $26,800,000. In view of the evidence it seems reasonable to use this figure when making a comparison with the $10,000,000 value placed by plaintiffs on the Mayflower. The use by the defendants' witnesses of a rate of capitalization similar to that used by plaintiffs seems quite reasonable in so far as these two Hilton assets are concerned. These two assets of Hilton, without considering other very valuable assets, appear to give Hilton stock a greater value than Mayflower stock on a comparable per share value. This is true even though we accept plaintiffs' calculations of the per share value of Mayflower stock.

One of Mayflower's directors testified that he did not see any pertinency to the going concern sale value of Mayflower in the case of a merger. While not conclusive, such a value factor most certainly would have been pertinent in determining the ultimate problem of fair value. I say this realizing that the property was not for sale. However, its value for that purpose is relevant to a determination of fair value for purposes of merger. However, one director's failure to consider one factor does not warrant the upsetting of an otherwise fair plan.

Several other matters in connection with valuation are mentioned by plaintiffs' counsel, but I do not believe they affect the fairness of the plan.

I conclude that no inference of fraud or bad faith is warranted from the case presented. I further conclude that under the present showing made by defendants the plan of merger is legally fair to plaintiffs and other minority stockholders of Mayflower. In view of the elaborate nature of the affidavits and depositions I see no reasonable probability of varying my conclusion at final hearing.

The application for a preliminary injunction is denied and the restraining order dissolved.

Order on notice.