HAROLD K. BARON,
Plaintiff,

*vs.*

PRESSED METALS OF AMERICA, INC., a Delaware corporation, and
FREDERICK W. RICHMOND,
Defendants.

*New Castle, October 19, 1955.*

*Robert C. Barab* and *Carl W. Mortenson,* Wilmington, and *Nathan B. Kogan,* New York City, for plaintiff.

*Berl, Potter & Anderson,* Wilmington, *Cleary, Gottlieb, Friendly & Hamilton,* New York City, and *Watson & Inman,* Port Huron, Mich., for corporate defendant.

MARVEL, Vice Chancellor : Plaintiff, a minority stockholder, suing for himself and all other stockholders of Pressed Metals of America, Inc., seeks a permanent injunction against a proposed sale of assets of the corporate defendant to the defendant, Richmond. The complaint which asked for preliminary injunctive relief was filed on August 3, 1955, however, by stipulation between plaintiff and the defendant corporation argument on the motion for preliminary relief was dispensed with and the stockholders met and approved the sale on August 16. Thereafter the case was tried and the consummation of the sale is being held in abeyance by agreement pending decision by the Court.

Plaintiff charges that the proposed sale to Richmond is for a price so inadequate as to constitute a gift of corporate assets and a fraud on the stockholders in that not only the fair value but the book value of the assets proposed to be sold to the buyer are so much in excess of the offered price as to indicate either improper motives

on the part of those passing judgment on the proposed sale or a deliberate disregard of the interests of all stockholders, including the minority.

The corporate defendant began as a small Canadian corporation, which, during the first world war using a process invented by Mr. John W. Leighton, then and now president of the corporation, manufactured bronze shrapnel tubes for the Canadian government. After the war this process was adapted to making bronze bushings for piston pins for the Ford Motor Company. When changes in design at Ford threatened to end the need for extruded bronze parts, Mr. Leighton turned his inventive genius to the job of designing steel automotive parts including steel shackles for car springs and later a threaded steel bearing for use in the independently suspended front wheels of automobiles. As each new invention was designed and patented, Mr. Leighton entered into an agreement granting the corporate defendant the exclusive right to manufacture the patented article. Such agreements forbid sub-licensing without the permission of the inventor but required permission to be granted to any financially responsible person provided royalty payments due from any sub-licensee were guaranteed by the licensee.

Starting in 1933 with the perfecting of the threaded bearing for wheel suspensions, the manufacture of this device became the principal business of the corporation and with the exception of the war years 95% of the production of this part until recently was sold to General Motors, Ford Motor Company and Chrysler Corporation. During the war years when automobile production was virtually halted, war work was engaged in principally the making of shackles for jeep springs. The company's success during this period is attributable to its ability to produce specialized automobile parts more cheaply than could the big automobile manufacturers.

A darkening of the bright post-war outlook for the company was foreshadowed in 1951 when Ford Motor Company gave notice that the design for its 1952 Lincoln would eliminate the corporate defendant's wheel suspension parts and that the same change would be made in Ford and Mercury design effective with the 1954 models. In 1953, Chevrolet gave similar notice and final orders from that

company were filled in the summer of 1954. While Chrysler remained a good customer, that company was experiencing difficulties in manufacturing and marketing its products. To heighten a generally gloomy picture, Pressed Metals became involved in management-labor problems in the spring of the same year. On June 24, 1954, management threatened its labor force with loss of their jobs through corporate liquidation, news of which reached the financial and business world. On June 26, the corporate directors authorized the officers of the corporation to investigate and determine the best method of selling or disposing of the assets of the corporation in the interests of the stockholders. A copy of this resolution was sent to the stockholders and responsible officers of the corporation set about developing plans for merging with or selling out to a company interested in a mutually attractive arrangement. Meanwhile corporate earnings had dropped from $4.30 to $2.34 per share in 1951 and to $1.08 per share in 1952. While earnings rose to $1.78 per share in 1953, they sunk to $.43 per share in 1954. A number of companies were canvassed and a firm offer for assets designed to net Pressed Metals' stockholders the sum of $12.50 per share was made by Thompson Products, Inc. This offer was rejected. In February, 1955, the defendant, Richmond, submitted a proposal to purchase Pressed Metals' assets for $5,124,180 less the corporation's cash and U. S. Government securities plus an assumption by Richmond of Pressed Metals' contractual liabilities as of the closing date. The offer contained an estimate that the amount to be realized per share as a result of acceptance of this offer would be the equivalent of $15 for each share of Pressed Metals' outstanding stock. This offer was also rejected.

In March, 1955, Mr. Albert, president of Bellanca Aircraft Corporation, offered to purchase Pressed Metals' live assets at book value for stock in Bellanca at its market price on the trading day next preceding the closing day for the transaction. The directors of Pressed Metals could find out little about Bellanca's financial situation and business prospects and were skeptical of the transaction which they found hard to evaluate. Nonetheless it was submitted without approval to the stockholders in a proxy statement and accompanying letter which made it clear that the board of directors opposed

selling assets for a volatile stock most of which was held by Mr. Albert. The stockholders overwhelmingly rejected the proposal.

On May 13, 1955, Mr. Richmond submitted a new offer in writing to Mr. Herbert L. Hutner, who had become a director of Pressed Metals on April 29. Richmond stated that he proposed to acquire the assets of Pressed Metals, "* * * subject to an assumption of its liabilities, for a purchase price of $6,800,000 so that the holders of the issued $1.00 par capital stock of the company shall realize the sum of $20.00 per share on each share of said stock." This proposal was discussed at a meeting attended by all but one of Pressed Metals' directors held in New York on May 27, at which Mr. Leighton, and his son disclosed that Mr. Richmond in the event the purchase was consummated proposed to retain present employees, · to name the Leightons respectively chairman of the board and president of the successor company and to pay the Leightons $500,000 for their interest in the patent rights held by them. The board reacted favorably to the offer and management was directed to request Mr. Richmond to submit a formal agreement. On June 28th the directors again met, Mr. Dozor being the only absentee. It was reported to the meeting by Mr. Sheriff, one of the directors, that he had met that morning with Mr. Albert of Bellanca, who again expressed a desire to purchase the corporate assets but not the Leighton patents at a price designed to net stockholders at least $2 more per share than Mr. Richmond's offer. Mr. Albert was told to submit his offer in writing for consideration at the directors' meeting to be held at 1 o'clock. No word having been received from Mr. ·Albert prior to adjournment of the meeting late in the afternoon and the directors being satisfied that the *proceeds of the sale,* added to an anticipated tax refund and a passing of the usual quarterly dividend would aggregate an amount equivalent to $20.50 per share for Pressed Metals' stockholders, approved the Richmond contract.

As has been held many times in this Court there is a presumption that directors act honestly and in the best interests of the stockholders in negotiating a contract for the sale of corporate assets, *Robinson v. Pittsburgh Oil Refining Corp.,* 14 *Del.Ch.* 193, 126 *A.* 46, *Gropper v. North Central Texas Oil Co., Del.Ch.,* 114

*A.2d* 231. In the absence of a showing that directors and majority stockholders are in some manner to share in profits arising from a sale of assets, proof of which is utterly lacking here, the requisite vote of stockholders authorizing the sale normally prevents Court review of a sale of assets, *Allied Chemical & Dye Corp. v. Steel & Tube Co.,* 14 *Del.Ch.* 1, 120 *A.* 486. If, however, the plaintiff can successfully carry the burden of showing that the disparity between the value of the property to be sold and the money to be received is so unreasonable as to be attributable to bad faith, the Court will infer some improper motive on the part of the sellers, or will assume that the sellers are recklessly indifferent to the interests of the whole body of stockholders,[1] *Allied Chemical & Dye Corp. v. Steel & Tube Co., supra; Allaun v. Consolidated Oil Co.,* 16 *Del.Ch.* 318, 147 *A.* 257; *Schiff v. RKO Pictures Corp., Del.Ch.,* 104 *A.2d* 267. The difficulty lies, as it so often does, in applying the principles established in this Court to the specific facts of the case for decision.

In a series of cases decided in the 1920's Chancellor Josiah Wolcott discussed valuation problems presented in cases arising under present § 271 of *Title* 8, *Del.C.* He decided that the right of the majority of stockholders to authorize a sale of assets is absolute even though dissenting stockholders are thereby deprived of the opportunity for future profits, provided, however, that the price to be paid, the manner of payment, and such like questions meet the test of the corporation's best interest. A large disparity between an appraisal based on the estimated cost of replacement of assets less depreciation based upon age and condition and the sale price troubled him in *Allied Chemical & Dye Corp. v. Steel & Tube Co., supra.* This difference[2] between value and price coupled with a situation involving a syndicate which had acquired 57% of the common stock of the

---

1. In the later case of *Mitchell v. Highland-Western Glass Co.,* 19 *Del.Ch.* 326, 167 *A.* 831, 833, the Chancellor defined a legally inadequate price for corporate assets to be an inadequacy "so gross as to display itself as a badge of fraud".

2. A difference between a so-called "book value" or "sound value" of $94,000,000 (the appraisal figure) and a sale price of $73,000,000.

corporation for the purpose of realizing a speculative fair profit convinced the Chancellor that a preliminary injunction should[3] issue.

 In the several phases of the case the Chancellor reiterated that value in a sale of corporate assets is not one of cost or replacement value but of value in connection with a sale; that such a sale presupposes a willing buyer and a willing seller; that a buyer can be expected to anticipate a profit, and that majority stockholders of a selling corporation are not guilty of improper motives in wanting to make a speculative profit. In the case of *Allaun v. Consolidated Oil Co., supra,* these principles were restated and reaffirmed. The Chancellor also considered important in the last cited case the fact that the defendant's assets had been for sale for some time, emphasizing not only the point that the value placed on assets by a purchaser can be expected to be made with an eye to the profit to be realized but also that the price offered in the agreement of sale which a substantial stockholder sought to enjoin was equal to the highest price contained in offers made by four other companies.[4]

Plaintiffs' contention is that a sale of assets, worth in his opinion in excess of $15,000,000, for approximately $2,000,000 is not in the best interests of the corporation. These figures require analysis. The equivalent amount per share available to stockholders if the Richmond proposal is consummated will be $20.50. Mr. Richmond's cash offer for the assets to be sold is the sum of $2,063,480.

The book value of Pressed Metal's assets taking into consideration its liabilities as of May 31, 1955, was $8,102,480, or the equivalent of $23.75 for each of the 341,615 outstanding shares of stock of the corporate defendant. The book value of the assets to be sold as of the same date was $4,902,826. Taking this latter figure as a

---

3. A meticulous analysis of the value of seller's assets after the taking of depositions convinced the Court that the terms and conditions of the proposed sale were expedient and for the best interests of the corporation and resulted in the granting of defendant's motion to dissolve the injunction. See opinion at 14 *Del. Ch.* 64, 122 *A.* 142.

4. In *Robinson v. Pittsburgh Oil Refining Corp., supra,* the Chancellor upheld a sale for a price which on its face was less in amount than a competing bid because the smaller bid also assumed corporate liabilities and offered cash.

beginning point plaintiff proceeds to add plus factors which in his contention establish the actual value of the assets to be sold.

Insofar as land, plant and equipment are concerned plaintiff submits that according to an appraisal made at the corporate defendant's request as of December 31, 1954, these assets had a "sound valuation" of $7,470,860.55 and a liquidation value of $2,471,284. A summary of this appraisal to which are also added assets of Acorn Products Company, a wholly owned subsidiary, was submitted to stockholders at the time of the Bellanca proposal, and again in the proxy statement sent out in connection with the final Richmond proposal. While the difference between the book value of these assets and the appraisal figures submitted in the report of Manufacturers Appraisal Company is substantial, the absence of any bid approximating the values set out in the appraisal and the factors considered below incline me to give little weight to its conclusions. While the appraisal itself was admitted in evidence, the persons who prepared it were not before the Court, and there is nothing in the record to show what consideration, if any, was given to the fact that much of the plant equipment involved is highly specialized and unsuitable for making anything other than the corporate defendant's specialized parts, the future use for which appears most problematical. While the appraisal was prepared for the purpose of giving directors and stockholders information about the value of the corporate assets in preparation for their disposal, it purports to be merely a "disinterested statement" of the cost of reproduction of assets and their sound valuation after allowance for depreciation. It was not accepted by the corporate defendant's directors as an accurate reflection of market value for specialized plant and equipment under current business conditions. The fact that a summary of the appraisal values was used to persuade stockholders to vote against the Bellanca proposal does not in my opinion work any estoppel. The same summary was submitted in the proxy statement which preceded the stockholders' meeting which authorized the sale of assets to the defendant, Richmond, at a price below book value.

The other principal plus factors, which, according to plaintiff, create a disparity of over $5,000,000 between actual value

and the sale price, have their basis in plaintiff's contentions about the Leighton patents. As has been indicated earlier in this opinion, Mr. John W. Leighton's inventive ability has been since before the first world war the keystone of the corporate defendant's past success and because of this fact among others a sale of assets was in the opinion of the directors expedient. Mr. Leighton, who testified with feeling about his life's work, is now a man in his early seventies, and while his inventive genius still flourishes in that at least one of nine possible new products developed by him and his son for the automobile trade, namely a new type of control bar, promises success, nonetheless the actual inventor has reached the twilight of a successful career. Because his inventions provided the basis for the resulting success of the corporation, I find nothing unusual or difficult to construe in the license agreements which obligated the corporation to pay royalties to Mr. Leighton. This is not a suit for cancellation or to try title. Furthermore, Mr. Leighton and his son are not parties to this proceeding but if they were I do not think this is the type of case which requires an employee to turn over his inventive work product to his employer. I am satisfied that through a thoroughly understood and established course of conduct the elder Leighton and the corporate directors accepted the patent license arrangement as a method of compensating Mr. Leighton for his enormous contribution to the business. Significantly, title to the patents was not carried on the corporate books as an asset. The gross sales of Pressed Metals over the past seventeen years total over $134,000,000. I do not believe that there was any intention on the part of either Mr. Leighton or the corporation that there was to be an assignment to the corporation of title to patents taken out in the Leighton name, or that such an assignment can be implied from the conduct of the parties. The maximum royalty payable to Mr. Leighton has for a number of years at his instance been set at a maximum of $75,000, an amount substantially below his rights under the contracts. In point of fact he has often waived payment of a substantial part of these royalties. Plaintiff does not contend that the patent use agreements between the Leightons and the corporation were concealed from the directors or stockholders. For many years the royalty payment arrangement has been disclosed in annual reports filed with the Securities Exchange

Commission. The Leightons were not present when the sale of the patents to Richmond received the directors' stamp of approval and the stockholders were given all the facts in the proxy statement. If in another proceeding title to the patents should be directly attacked it would appear that a stockholder of the present corporate defendant would be a proper plaintiff, *Daily v. Universal Oil Products Co., D.C.N.D.Ill.,* 76 *F.Supp.* 349, although it should be noted that in the cited case the patents in question were carried on the books of the selling corporation. Here the Leighton patents were not carried as a corporate asset or included in the sale of corporate assets and I am satisfied that the defendant, Richmond, considered the $75,000 annual royalties due Mr. Leighton to be a corporate liability which he assumed by outright purchase of the patents for the sum of $500,000. In any event title to the patents cannot be determined in this proceeding to which the record owners of the patents are not parties. Accordingly the moneys claimed to be due the corporation because of its alleged equitable ownership of established patent processes or of the new patents registered in the name of both Leightons and for past royalty payments to the elder Mr. Leighton will not be added to the book value figure of Pressed Metals' assets.

Two other plus factors cited by plaintiff are the good will inherent in the corporate defendant's name and the value to the defendant, Richmond, of the seller's agreement not to compete. No specific value is placed on these factors, and I do not find it necessary to evaluate them. Because John D. Leighton's abilities were the life blood of Pressed Metals, and because the corporation's earning record in recent years has not been impressive, I do not think corporate good will is a measurable factor. As for the agreement not to compete, it would appear that the future of the selling corporation is one of orderly liquidation after limited continuance as an investment trust for tax purposes. It has surrendered nothing of value in agreeing not to compete.

On the other hand the minus factors which have been extensively reviewed in this opinion tend to make the proposed sale a desirable corporate act. So-called "going concern" value cannot but be affected by these factors. In the light of the corporation's type

of business and the trend of its earnings I am also convinced that the value of the assets to be sold do not have a value of more than eight to seven times normal earnings, a ratio accepted in the analogous case of *Cottrell v. Pawcatuck Co., Del.Ch.,* 116 *A.2d* 787. Furthermore in view of the nature of the business of the corporate defendant and the reasons for the sale the disparity between book value of $4,902,826 for assets for which the buyer proposes to pay $2,063,480 and assume liabilities of $431,503 is not in my opinion[5] so great as to warrant an implication of fraud.

Plaintiff next charges concealment from the stockholders of a provision of the contract of sale which gives to the buyer the benefit of any profits made by the corporation from the date of the contract to the closing date. By the same token the buyer must sustain any loss during this period. Because of net losses in June and July, if the closing date had been July 31, 1955, the buyer would have been obligated to advance over $300,000 more than the amount shown in the proxy statement as payable by the buyer. The provision in question was designed to work both ways.

Implicit in plaintiff's attack as to fairness is a charge of self-interest on the part of certain New York stockholders, who with their customers bought heavily into Pressed Metals' stock when they discovered in 1954 that the book value of the corporate stock was substantially in excess of its market value. In view of the announced plan of sale of assets or merger, buyers of Pressed Metals stock could expect to profit. Undoubtedly several of them engaged actively in seeking out a willing buyer, and it was to Mr. Hutner, one of four of the so-called broker group, who came on the board of nine directors, that Mr. Richmond addressed his proposal of May

5. Compare *Cottrell v. Pawcatuck Co., supra,* in which this Court approved a sale of assets. Plaintiff was unsuccessful in her argument as to disparity between book value of $6,539,345 and the sale price of $3,194,448. In the cited case a tax refund was not counted by the Court in testing the fairness of the sale price, however, it was not ignored in determining the wisdom of the decision to sell. In the case at bar the buyer has in effect guaranteed a tax refund in the amount of $712,700 provided Pressed Metals conforms to the requirements of the federal tax law allowing a refund when assets are sold below book value. This refund is not included in the sum of $2,063,480.

13, 1955. I am satisfied that neither these new stockholders nor the old stockholders, including Mr. John W. Leighton, who held a substantial number of shares, had any motive other than that of following a course of business expediency in authorizing a sale which in their opinion was in the best interests of all stockholders. The defendant, Richmond, made the best firm offer. None of the directors or stockholders of Pressed Metals is interested in any of the buyer's businesses. Finally the fact that the two Leightons are to be employed by the buyer is not a badge of fraud, *Mitchell v. Highland-Western Glass Co., supra.*

I conclude that plaintiff has not sustained the burden of proving the proposed sale of assets under attack to be in violation of the fiduciary duty of directors and majority stockholders. Judgment for the corporate defendant will be entered.

Order on notice.