**John PUMA, Plaintiff,**

v.

**J. Willard MARRIOTT et al., Defendants.**

Court of Chancery of Delaware,
New Castle.

Oct. 20, 1971.

Ernest S. Wilson, Jr., Wilmington, Stanley L. Kaufman, Shephard S. Miller and Allan K. Peckel, of Kaufman, Taylor, Kimmel & Miller, New York City, for plaintiff.

David F. Anderson, of Potter, Anderson & Corroon, Wilmington, and Burton A. Schwalb, of Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., for certain individual defendants.

Henry M. Canby, of Richards, Layton & Finger, Wilmington, and Frank H. Strickler, of Whiteford, Hart, Carmody & Wilson, Washington, D. C., for Marriott Corp. and certain individual defendants.

SHORT, Vice Chancellor.

This is a stockholder's derivative action which challenges the fairness of a transaction entered into by Marriott Corporation (Marriott), a Delaware corporation, whereby Marriott, in exchange for 313,000 shares of its common stock, acquired all of the stock of six corporations principally owned by members of the Marriott family.   De-

fendants are those members of the Marriott family and others (Marriott Group) whose stock was acquired, four of whom were directors of Marriott (inside directors), and four of the remaining five directors (outside directors), one having died before commencement of the action. This is the decision after final hearing.

Marriott, originally wholly owned and operated by the Marriott family, was incorporated in 1929 under the name of Hot Shoppes, Inc., later changed to Marriott-Hot Shoppes, Inc., and then to its present name. Over the years the corporation's restaurant and related business expanded rapidly. In March 1953 when its stock was first sold to the public Marriott was operating at 45 locations with gross sales at the end of the fiscal year, July 31, 1952, in excess of $19,000,000 and net after-tax profit exceeding $532,000. At fiscal year end July 31, 1969 it was operating at 324 locations with gross sales exceeding $257,-000,000 and net after-tax profit in excess of $10,000,000. From March 1953 Marriott stock was traded on the over-the-counter market until 1968 when it was listed on the New York Stock Exchange.

The acquisition of which plaintiff complains was consummated on January 4, 1966. It was authorized on September 10, 1965 by unanimous resolution of Marriott's outside directors, none of whom were officers or employees of Marriott and all of whom were prominent in legal, financial or business affairs in and about the City of Washington, D. C. The corporations acquired (property companies) were the owners or lessees of real property leased or sub-leased to Marriott. Each of the leases required Marriott to pay all real estate taxes, insurance, costs of repairs, replacement and utilities together with a fixed guaranteed minimum rental subject to increases based on sales. Since the property companies were principally owned by the Marriott Group there had long been a feeling among the directors that possible conflicts of interest could be avoided by severing the related interests. This feeling was accentuated when

Marriott in 1964 inquired of the New York Stock Exchange concerning requirements for the listing of its stock and was informed that it would qualify if its relationship with the property companies was severed. The desire for such listing coupled with the belief that the acquisition would be for the benefit of Marriott led the outside directors to explore the possibility of acquiring the property companies.

The Marriott family initially was not interested in disposing of their real estate holdings for Marriott stock, the testimony indicating that they considered these interests as investment diversification in increasingly valuable assets and further that the additional Marriott shares which they would receive would not substantially increase their 44% ownership of the corporation's stock. At the urging of management officials and the outside directors the family ultimately agreed to a stock exchange. In the meantime, the outside directors had obtained from independent real estate appraisers appraisals of the real estate of the property companies. At least two appraisals were obtained on each property. Independent counsel, tax experts and accountants to advise the outside directors were retained. An independent firm of analysts was employed at the instance of independent counsel to value the Marriott stock. Company officials, none of whom were members of the Marriott Group, furnished information to and correlated data for the outside directors.

On August 10, 1965 at a meeting of Marriott's board the outside directors formally approved acquisition of the stock of the property companies on a non-taxable basis but determination of the number of Marriott shares to be exchanged was postponed until the next monthly board meeting scheduled for September 10, 1965. On the latter date, based on the appraisals, the analysts' computation of the value of Marriott stock, other data and the recommendation of independent counsel, the outside directors authorized, subject to the approval of Marriott stockholders, 375,000 unregistered

shares of Marriott stock to be issued in exchange for the shares of the property companies owned by the Marriott Group. The number of Marriott shares to be exchanged was computed by taking the high appraisal for each of the properties adjusted by other assets and liabilities of the property companies and dividing into the figure thus obtained ($7,760,006) the per share value ($20.69) of Marriott stock as determined by the directors. The stockholders of the property companies agreed to the exchange on this basis.

In October 1965 the trading price of Marriott stock having risen from 2 to 3 points over the price prevailing on September 10, 1965, at the instance or with the approval of the Marriott Group, the number of shares of Marriott stock to be exchanged was recomputed and reduced to 313,000. This figure was arrived at by using the average of the high and low appraisals. On this basis the net value of the property companies was determined to be $7,086,007 and this figure was divided by $22⅝ the recomputed value of a share of Marriott stock.

At the annual meeting of shareholders of Marriott on November 9, 1965 the acquisition of the stock of the property companies for 313,000 shares of Marriott stock was presented to and approved by the stockholders including the plaintiff. The closing of the transaction took place on January 4, 1966.

■ Plaintiff contends that since the case involves insiders dealing with their corporation the test of validity of the transaction is fairness. That our courts have frequently so held is without question. Thus in Sterling v. Mayflower Hotel Corp., 33 Del.Ch. 20, 93 A.2d 107, the Supreme Court said: "Since they stand on both sides of the transaction, they bear the burden of establishing its entire fairness." And in David J. Greene & Co. v. Dunhill International, Del.Ch., 249 A.2d 427, the Chancellor stated that it is unquestionably the substance of our decisions that "when the persons, be they stockholders or directors, who control the making of a transaction and the fixing of its terms, are on both sides, then the presumption and deference to sound business judgment are no longer present." See also, Levien v. Sinclair Oil Corp., Del. Ch., 261 A.2d 911, rev'd in part on other grounds, Del.Supr., 280 A.2d 717; Johnston v. Greene, 35 Del.Ch. 479, 121 A.2d 919; Schiff v. RKO Pictures Corp., 34 Del.Ch. 329, 104 A.2d 267; Abelow v. Midstates Oil Corp., 41 Del.Ch. 145, 189 A.2d 675. In each of the cited cases, however, it either affirmatively appeared that the insider or insiders dominated the board of directors or the court found such to be the fact. Except to point out that the Marriott Group owned some 46% of the Marriott stock plaintiff here has utterly failed to make any showing of domination of the outside directors. No attempt was made to impugn the integrity or good faith of these directors, all of whom were men of experience in the business and financial world. There is no testimony which even tends to show that the terms of the transaction were dictated by the Marriott Group or any member thereof. On the contrary, the valuations of the property companies and the Marriott stock were made by a majority of Marriott directors, whose independence is unchallenged, based upon appraisals, analysis, information and opinions provided by independent experts, whose qualifications are not questioned. In these circumstances it cannot be said that the Marriott Group stood "on both sides of the transaction" within the meaning of the rule followed in the cases above cited. Therefore, the test here applicable is that of business judgment, there being no showing of fraud. Compare, Lipkin v. Jacoby, 42 Del.Ch. 1, 202 A.2d 572; Beard v. Elster, 39 Del.Ch. 153, 160 A.2d 731; Fidanque v. American Maracaibo Co., 33 Del.Ch. 262, 92 A.2d 311.

Plaintiff argues that the methods used by the appraisers and analysts resulted in overvaluation of the property companies and undervaluation of the Marriott stock. The expert testimony and legal analysis on these issues are in hopeless conflict. But

since I am satisfied that in any event the methods of valuation used were not so clearly wrong as to result in an unconscionable advantage secured to the Marriott Group, resolution of these issues is not required.

I conclude that since the transaction complained of was accomplished as a result of the exercise of independent business judgment of the outside, independent directors whose sole interest was the furtherance of the corporate enterprise, the court is precluded from substituting its uninformed opinion for that of the experienced, independent board members of Marriott. Beard v. Elster, *supra*. Having so decided it is unnecessary to consider defendants' contention that ratification of the transaction by Marriott's stockholders effectively barred this action.

On the consummation of the transaction Marriott assumed an interest-free obligation of Brentwood Properties, Inc., one of the property companies, to Alice Marriott in the amount of $362,500 for which 132,282 shares of Marriott stock owned by Brentwood were pledged as security. The obligation was payable in annual installments and Brentwood was in default in payment of two installments. Upon acquiring the obligation Marriott's board authorized its immediate payment. Plaintiff contends that prepayment of this indebtedness cost the company $162,000 resulting in a waste of corporate assets to that extent. Defendants deny any loss occasioned by the payment and their analysis of the testimony tends to support their denial. In any event, in the light of the circumstances involved I find no merit in this contention. While Marriott was under no obligation to pay the indebtedness on January 4, 1966, the date of the closing, the directors' authorization was an exercise of business judgment. Shaw v. Norfolk County R. Co., 16 Gray 407. Neither fraud or bad faith on the part of the directors is charged or shown. Nor can it be said that their action was in reckless disregard of the interests of the corporation or the rights of its stockholders

for the testimony discloses sound business reasons for paying the obligation. It released from pledge the 138,282 shares of Marriott stock for use in consummating the transaction as a whole. And, it was in furtherance of the severing of the conflict of interests problem which the transaction was primarily designed to accomplish.

Nor did payment in full of Brentwood's obligation create a windfall for Alice Marriott as plaintiff's argument might seem to suggest. Though payable in installments the indebtedness was $362,500 The obligation made no provision for discounting to the then present value in the event of prepayment. The directors, in the exercise of their business judgment having authorized prepayment, Mrs. Marriott was rightfully paid the full amount of the indebtedness.

Judgment will be entered for defendants. An order accordingly may, on notice, be submitted.