Anthony G. **ROTH**, Appellant,

v.

Jeffrey H. **MIMS**, Trustee of the Estate of **Performance Nutrition, Inc.,** Appellee.

No. Civ.A.3:00–CV–04470–L.

United States District Court, N.D. Texas, Dallas Division.

March 14, 2003.

Fredrick E. Roth, Richard T. LiPuma, Roth/LiPuma Law Firm, P.C., for appellant.

W. Mike Baggett, John P. Kincade, Christopher W. Carr, Phillip L. Lamber-

son, Winstead Sechrest & Minick P.C., Dallas, TX, for appellee.

## MEMORANDUM OPINION AND ORDER

LINDSAY, District Judge.

Appellant Anthony G. Roth ("Roth") appeals the bankruptcy court's order awarding costs, entered on May 21, 1999, its Amended Findings of Fact and Conclusions of Law, entered on March 23, 1999, and corresponding Amended and Final Judgment, entered on March 22, 1999. After careful consideration of the parties' briefs, the record on appeal, and the applicable law, the court finds no reversible error. Accordingly, the judgment of the bankruptcy court and the award of costs is **affirmed.**

## I. *Factual and Procedural Background*

Performance Nutrition, Inc. ("PNI") was formed in 1988, and its business primarily involved developing, marketing, and selling nutritional supplement products. From 1991 to 1996, PNI spent approximately $7 million advertising and marketing its products and had developed a certain level of brand equity or recognition. By 1995, PNI's sales were approximately $3.4 million. In the spring of 1996, PNI started selling its products through General Nutrition Centers, Inc. ("GNC"), the largest nutritional supplement retailer in the United States.

In August of 1996, Kennedy Capital Management, Inc. ("KCM"), PNI's largest shareholder, organized and effected a takeover of PNI to oust chief executive officer ("CEO") Gary Lewellyn, who was suspected of wrongdoing. As part of the takeover, KCM also solicited Roth, a former PNI consultant, to serve as PNI's new CEO, president, and board chairman. In a written agreement, Roth promised to devote "his best efforts and substantially all of his business time and attention" to PNI and agreed not to compete with PNI for two years after leaving the company. When Roth assumed office, PNI was experiencing a number of problems as a result of prior mismanagement, including shareholder litigation, regulatory problems, an infomercial marketing strategy that was not cost-effective, and other problems, which threatened to deplete PNI's existing cash reserves of $600,000 to $700,000.

At the time Roth took office, Naturade, Inc. ("Naturade") was PNI's primary vendor and blender. As PNI's blender, Naturade mixed the various nutrients and other components in products sold by PNI. In the fall of 1996, Naturade's vice president and general counsel Michael Fernicola ("Fernicola"), acting under the authority and knowledge of Naturade's president Alan Schulman ("Schulman"), approached Roth to discuss Naturade's offer to acquire PNI's assets, including PNI's business with GNC. This offer included an agreement for Naturade to employ Roth and two other PNI employees, who had business contacts with GNC. The proposed employment agreement included a salary, commissions on the sale of PNI products, stock options, and an officer position of Performance Nutrition, a division of Naturade ("PNDN").

In October or November of 1996, Fernicola contacted Dr. L.S. Smith ("Smith"), a longtime business consultant to Naturade with extensive bankruptcy experience. Fernicola asked Smith to contact Roth and act as Naturade's agent to work out an agreement for Naturade to acquire PNI's assets. Smith introduced Roth to the concept of commencing a Chapter 11 bankruptcy proceeding with an immediate motion to sell PNI's assets under § 363 of the Bankruptcy Code. By December 10, 1996, Smith and Roth came to an agreement

whereby Naturade would acquire PNI's assets through a bankruptcy proceeding like the one proposed by Smith. That same day, Roth called one of PNI's attorneys, Karl Nielson ("Nielson"), and told him that "there was a movement afoot" for Naturade to acquire PNI and the information had to be "kept quiet." Nielson memorialized this conversation in a memorandum to Kirk Lenhard ("Lenhard"), one of his partners. From conversations Lenhard had with Roth, Lenhard gained the impression that Roth was going to be employed by Naturade after PNI's bankruptcy.

The material terms of the proposed agreement were set forth in a personal and confidential letter Smith sent to Roth on December 22, 1996. The letter stated that after "extensive discussions" with Schulman and Fernicola, Smith would recommend to Naturade's board a transaction whereby: (1) PNI would file a Chapter 11 bankruptcy petition; (2) Naturade would offer to acquire all of PNI's assets pursuant to § 363 of the Bankruptcy Code in exchange for 675,000 shares of newly issued restricted Naturade common stock; (3) Naturade would form a new corporate entity to serve as a repository of the assets; and (4) Naturade would negotiate with certain PNI officers to serve as operating management of the newly formed entity, including compensation arrangements, performance participation, roles in the overall management of Naturade, and the formulation of equity incentives.

On January 9, 1997, Roth and Smith conferred for the first time with PNI bankruptcy attorney Glenn Portman ("Portman") by telephone. In a conference call, Roth told Portman about his intent to commence a Chapter 11 bankruptcy proceeding and file a § 363 motion to sell PNI's assets to Naturade. Roth also revealed to Portman that he had had

employment discussions with Naturade at some earlier point, but neither Roth nor Naturade disclosed the existence of the December 22 letter; nor was the letter or its material terms disclosed at any point to PNI's shareholders, board of directors, or the bankruptcy court. Regarding the § 363 motion, Portman and Peter Kerth ("Kerth"), another of PNI's bankruptcy attorneys, advised Roth and Smith that there was a 95% chance the bankruptcy court would deny the motion as proposed and would likely convert the case to a Chapter 7 bankruptcy proceeding whereby PNI's assets would be liquidated a price much lower than the value. Smith indicated that the § 363 sale of PNI's assets was a condition of Naturade's offer and that the approval or denial of the motion was of no concern to Naturade.

On January 20, 1997, Roth and Fernicola, on behalf of PNI and Naturade, signed a Letter of Intent to sell PNI's assets to Naturade. The following day, on January 21, 1997, PNI filed for Chapter 11 bankruptcy with only $26,400 in cash remaining, which was insufficient to support PNI's business operations. That same day, Roth sent a letter to GNC offering Naturade's blending services. On January 24, 1997 and February 7, 1997, Roth sent similar letters to Internutria, another nutritional company, offering Naturade's services. On January 28, 1997, PNI filed a § 363 Emergency Motion to sell all of its assets to Naturade. In conjunction with this motion, PNI also filed its Schedules and Statement of Financial Affairs, which failed to include numerous disclosures, some of which were material. The § 363 motion did not mention the December 22 letter. PNI also filed an Emergency Motion to Factor GNC's receivables from the sale of PNI's assets, because it was unable to fill a $325,000 order placed by GNC due to its low cash reserves.

Before the bankruptcy court ruled on PNI's motion, Roth sent a document entitled "Executive Summary" to Naturade at Naturade's request on or about February 3, 1997. This document set forth some of the specific terms of the employment agreement being negotiated by the parties and stated that "Performance Nutrition will operate as a wholly-owned subsidiary of Naturade ... and ... Anthony Roth will serve as president." The document also provided that Roth would relocate and work out of Naturade's office in Los Angeles. The Executive Summary was not disclosed to the bankruptcy court.

On February 18, 1997, the bankruptcy court heard and denied PNI's Emergency Motion to Factor. At the hearing on the motion, Roth denied discussing possible employment opportunities with Naturade, and denied that an offer of employment had been made. On February 19, 1997, the bankruptcy court heard and denied PNI's § 363 Emergency Sale Motion. At the hearing, Fernicola testified that he had not discussed employment with any of PNI's employees. He further testified that no stock or finder's fees had been offered to anyone. Similarly, Smith testified that employment negotiations were not his area of involvement and he was unaware of any offers of employment that had been made to PNI employees as part of the proposed deal. After denying the motion, the bankruptcy court appointed Jeffrey H. Mims ("Mims") as PNI's Chapter 11 trustee. At the time of Mims's appointment, PNI had approximately $40,000 in cash, no employees, and no operations.

After his appointment as trustee, Mims seized several documents from PNI's offices that refer to employment negotiations between Roth and Naturade. Among these documents was an unsigned letter from Fernicola to Roth that set forth the terms of Roth's compensation package as president of NaturePlex, Inc., a wholly owned subsidiary of Naturade. This letter was later determined to have been drafted by Roth. Also seized was a January 15, 1997 fax to Fernicola on Roth's stationery, which was signed by Roth. This fax contained the proposed compensation packages for two other vital PNI officers and was sent after PNI attorney Portman had told Roth not to discuss employment with Naturade any further. In addition, handwritten notes by Roth were seized. These notes track the language in the letter to Fernicola and included reimbursement for moving expenses.

On April 15, 1997, a Chapter 7 auction of PNI's assets, excluding real property, was conducted. Smith, acting as Naturade's agent, purchased PNI's assets, including its trademarks, trade names, formulas, product lines, and customer lists, for $275,000. Within one hour of the auction, Naturade hired Roth and two other PNI employees, one of whom was PNI's GNC contact, Scott Dmitrenko. As a term of his employment with Naturade, Roth was to receive commissions on the sale of PNI's products to GNC.

On October 3, 1997, Mims, as trustee, sued Roth, KCM, Naturade, and David Wynne for breach of fiduciary duties, conspiracy to breach fiduciary duties, aiding and abetting the breach of fiduciary duties, tortious interference with a contract, unjust enrichment, and exemplary damages. After a seventeen-day bench trial spanning several months, the bankruptcy court entered judgment in favor of Mims and against Roth in the amount of $1,774,000 in actual damages (jointly and severally with Naturade) and $1,000,000 in exemplary damages upon a finding that Roth breached his corporate fiduciary duties of care and loyalty to PNI as a director, and his Chapter 11 fiduciary duties as a debtor in possession. The bankruptcy court also found that Roth conspired with codefen-

dant Naturade, which is not a party to this appeal, and awarded $1,000,000 in exemplary damages against Naturade. On appeal, Roth contends that the bankruptcy court erred in: (1) applying Texas rather than Nevada law; (2) concluding that Roth breached his fiduciary duties of care and loyalty; (3) awarding damages and costs; (4) and failing to *sua sponte* recuse himself.

## II. *Standard of Review*

■ In a bankruptcy appeal, district courts review bankruptcy court rulings and decisions under the same standards employed by federal courts of appeal; "conclusions of law are reviewed de novo, findings of fact are reviewed for clear error, and mixed questions of fact and law are reviewed de novo." *In re National Gypsum Co.*, 208 F.3d 498, 504 (5th Cir.), *cert. denied*, 531 U.S. 871, 121 S.Ct. 172, 148 L.Ed.2d 117 (2000); *In re Bass*, 171 F.3d 1016, 1021 (5th Cir.1999) ("Mixed questions of fact and law, and questions concerning the application of law to the facts, are reviewed de novo."). A bankruptcy court's "findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." Fed. R. Bankr.P. 8013. A finding is clearly erroneous and reversible only if, based on the entire evidence, the reviewing court is left "with the definite and firm conviction that a mistake has been made." *Id.; Matter of Allison*, 960 F.2d 481, 483 (5th Cir.1992). In conducting this review, the court is "particularly mindful of 'the opportunity of the bankruptcy judge to determine the credibility of the witnesses.'" *Matter of Young*, 995 F.2d 547, 548 (5th Cir.1993)(quoting Rule 8013).

## III. *Analysis*

### A. *Failure to Designate Issues*

■ As a preliminary matter, Mims contends that Roth waived the following issues by failing to designate them as required by Federal Rule of Bankruptcy Procedure 8006: (1) whether the bankruptcy court disregarded appropriate choice of law principles; (2) whether under Nevada law Roth breached his fiduciary duties; (3) whether the appointment of Mims was the sole remedy available to the estate; (4) whether the trustee's actions were an intervening cause; and (5) whether the bankruptcy court erred by awarding excessive punitive damages and costs. Roth, on the other hand, contends that his statement of issues is sufficient to embrace or encompass these issues. For support, he cites *In re CPDC Inc.*, 221 F.3d 693 (5th Cir.2000).

Federal Rule of Bankruptcy Procedure 8006 requires appellants to "file with the clerk and serve on the appellee a designation of the items to be included in the record on appeal and a statement of the issues to be presented" within 10 days of filing a notice of appeal. Fed. R. Bankr.P. 8006. Rule 8006 further requires appellants to "provide to the clerk a copy of the items designated" and arrange for any transcripts to be delivered to the clerk. *See id.* "An appellant's failure to take any step other than timely filing a notice of appeal does not affect the validity of the appeal, but is ground only for such action as the district court ... deems appropriate, which may include dismissal of the appeal." Fed. R. Bankr.P. 8001(a).

The Fifth Circuit observed in *In re CPDC Inc.* that "only the failure to file a notice of appeal, which deprives the reviewing court of jurisdiction, mandates dismissal." *Id.* at 698. In contrast, dismissal for breaches of other procedural rules, including Rule 8006, is a harsh and drastic sanction, which is not appropriate in all cases even though it lies within the court's

discretion. *Id.* Although the Fifth Circuit declined to establish a definitive list of factors, it stated that

> in determining whether dismissal is an appropriate sanction, a district court should keep in mind that some infractions of the rules of bankruptcy procedure are harmless and do not merit dismissal; that dismissal unfairly punishes clients for the mistakes of their counsel in some cases; and that the primary goal of courts as enforcers of the bankruptcy rules should be to ensure the swift and efficient resolution of disputes pertaining to the distribution of the bankruptcy estate.

*Id.* at 700. The court concluded that this approach was in consistent with the purpose of the record designation requirement, which is "to provide the reviewing court with an adequate basis for evaluating the appellant's claims on appeal." *Id.* at 698. It is the appellant's burden, however, to create an adequate record, and the appellant "may not urge an issue on appeal if he has failed to provide the appellate court with the requisite record excerpts." *Id.*

With these considerations in mind, the court determines that Roth's failure to designate these specific issues was not the result of bad faith, that the failure did not rise to the level of "obstinately dilatory conduct," and that Mims has not shown prejudice from the delay. *See id. (quoting In re Braniff Airways, Inc.,* 774 F.2d 1303, 1304 (5th Cir.1985) and *Pyramid Mobile Homes, Inc. v. Speake,* 531 F.2d 743, 746 (5th Cir.1976)). The court will therefore consider these undesignated issues if the issues were not otherwise waived by Roth. *See Vogel v. Veneman,* 276 F.3d 729, 733 (5th Cir.2002). The court therefore rejects Mims's argument that Roth waived certain issues by failing to designate them.

## B. *Recusal*

█ Roth contends that bankruptcy Judge Harold Abramson should have *sua sponte* recused himself pursuant to 28 U.S.C. § 455(a), because he was familiar with the facts of the case due to his presiding over other related hearings and most, if not all, of his rulings were adverse to him. Roth therefore argues that Judge Abramson was impartial in considering the evidence and requests that the judgment entered by Judge Abramson be vacated. The court disagrees.

█ Section 455(a) provides that: "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). "This recusal standard is objective; the relevant inquiry is whether a 'reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality." *Trevino v. Johnson,* 168 F.3d 173, 178 (5th Cir.), *cert. denied,* 527 U.S. 1056, 120 S.Ct. 22, 144 L.Ed.2d 825 (1999) (quoting *Health Servs. Acquisition Corp. v. Liljeberg,* 796 F.2d 796, 800 (5th Cir.1986), *aff'd,* 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855(1988)). "[O]ne seeking disqualification must do so at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification." *Travelers Ins. Co. v. Liljeberg Entrs., Inc.,* 38 F.3d 1404, 1410 (5th Cir.1994). "The most egregious delay— the closest thing to per se untimeliness— occurs when a party already knows the facts purportedly showing an appearance of impropriety but waits until after an adverse decision has been made by the judge before raising the issue of recusal." *United States v. Vadner,* 160 F.3d 263, 264 (5th Cir.1998).

Roth did not move for Judge Abramson's recusal in the trial court and acknowledges that he raises the issue for the

first time on appeal. Roth therefore failed to timely raise the issue. *Id.* Even assuming it had been timely raised, the mere fact that Judge Abramson had presided over related hearings and ruled adversely to Roth is not evidence of impartiality that would require him to *sua sponte* recuse himself, because the Fifth Circuit has previously held that opinions a judge forms "based on information that he acquires in earlier proceedings are not subject to deprecatory characterizations as bias or prejudice, for it has long been regarded as normal and proper for a judge to sit ... in successive trials involving the same [parties]." *United States v. Bremers,* 195 F.3d 221, 228 (5th Cir.1999). Moreover, the judicial rulings complained of do not demonstrate a "deepseated and unequivocal antagonism that would render fair judgment impossible." *United States v. Mizell,* 88 F.3d 288, 300 (5th Cir.1996), *cert. denied,* 519 U.S. 1046, 117 S.Ct. 620, 136 L.Ed.2d 543 (1996) (quoting *Liteky v. United States,* 510 U.S. 540, 551, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)). The court therefore determines that Judge Abramson did not err in failing to *sua sponte* recuse himself.

## C. *Choice of Law*

■ Roth contends that the bankruptcy judge erred as a matter of law in applying the substantive law of Texas rather than Nevada in determining whether he breached his fiduciary duty of loyalty or duty of care as a director of PNI, because Nevada is more favorable than Texas in its application of the business judgment rule and corresponding presumption that the acts of corporate directors are done in good faith rather than in self interest. Roth further contends that regardless of which state's laws apply, the bankruptcy court erred in not giving him the benefit and protection of the business judgment rule.

In response, Mims argues that even if the bankruptcy judge erred in applying Texas law, the error was harmless, because Nevada and Texas law are similar regarding the application of the business judgment rule, that is, neither state applies the business judgment rule in cases such as this where there is evidence of self-dealing and conflicts of interest. Mims therefore contends that the bankruptcy court did not err in declining to give Roth the benefit of the business judgment rule.

In his reply brief, Roth acknowledges that the laws of the two states are similar in many respects, but maintains that the states apply the business judgment rule differently. Specifically, he contends that unlike Nevada statutory law, which presumes that "that the acts of corporation directors are honest and in the best interests of the company," the Texas legislature has not enacted the presumption of good faith. Roth further contends that even though Texas case law provides that directors are entitled to presumption of good faith, no Texas authority has defined how the presumption is applied or how it may be rebutted. Roth therefore maintains that the application of Texas rather than Nevada law denied him the protection of the business judgment rule and the corresponding presumption that he acted in the best interests of PNI.

■ The Texas business judgment rule, which originated in *Cates v. Sparkman,* 73 Tex. 619, 11 S.W. 846, 849 (1889), provides that the negligence of directors, no matter how unwise or imprudent, does not constitute a breach of duty if the acts were "within the exercise of their discretion and judgment in the development or prosecution of the enterprise in which their interests are involved." *Resolution Trust Corp. v. Acton,* 844 F.Supp. 307, 315 (N.D.Tex.1994) (quoting *Cates,* 11 S.W. at

849). Texas courts, like other jurisdictions, do not apply the business judgment rule in cases where the challenged corporate decision "lacks a business purpose, is tainted by a conflict of interest, is so egregious as to amount to a no-win decision, or results from an obvious and prolonged failure to exercise oversight or supervision." *Resolution Trust*, 844 F.Supp. at 314.

■ Similarly, under Nevada law, the business judgment rule postulates that "if directors' actions can arguably be taken to have been done for the benefit of the corporation, then the directors are presumed to have been exercising their sound business judgment rather than to have been responding to self-interest motivation." *Horwitz v. Southwest Forest Indus., Inc.*, 604 F.Supp. 1130, 1135 (D.Nev. 1985) Corporate directors, however, may only rely on the business judgment rule as a defense if: "(1) they acted in a good faith belief that their conduct was in the corporation's best interests; (2) they exercised due care in ascertaining the relevant facts and law before acting; and (3) they [did not] act in self-interest." *Id.* at 1134.

■ In the present case, it appears that the bankruptcy court determined, without conducting a choice of law analysis, that the substantive laws of Texas applied and concluded that:

6. Roth may not use the business judgment rule as a defense to his choices with regard to the sale of PHI's assets to Naturade, nor to any other of his b[r]eaches of the duty of care and the duty of loyalty due to his conflict of interest. The business judgment rule provides a presumption that the officers and directors of a corporation, in making a business decision for that corporation ... acted in the best interest of the corporation....

7. Because Roth acted in self-interest, he may not enjoy the protection of the business judgment rule. Roth could not have believed that his actions were in the best interest of PNI, all the while denying the existence of, and intentionally covering up, his negotiations with Naturade. Also, with regard to the sale of PNI's assets, Roth was not acting in the best interest of PNI when he did not obtain a valuation of PNI's assets, when he failed to shop PNI's assets in the open market in order to locate possible willing buyers other than Naturade, and when he failed to set up a procedure whereby competing bids for PNI's assets could be offered and considered. The business judgment rule is inapplicable in this case.

Bankruptcy Court's Amended Findings of Fact and Conclusions of Law at 25–26 (internal citations omitted). In his appellate brief, Roth cites his Proposed Findings of Fact and Conclusions of Law as well as Mims's Proposed Findings of Fact and Conclusions of Law, contending for the first time on appeal that "[a]lthough both Roth and Mims cited Nevada law in their trial briefs, the bankruptcy court cited only Texas law in its analysis of Roth's breaches of fiduciary duties." While a choice of law issue may be addressed for the first time on appeal, courts will only do so where manifest injustice would otherwise result. *Employers Ins. of Wausau v. Occidental Petroleum Corp.*, 978 F.2d 1422, 1430 (5th Cir.1992), *cert. denied,* 510 U.S. 813, 114 S.Ct. 61, 126 L.Ed.2d 30 (1993).

Because Roth filed Amended Proposed Findings of Fact and Conclusions of Law, the court declines to consider any reference to his original Findings of Fact and Conclusions of Law. Moreover, while it is true that the parties may have cited a

couple of Nevada cases, they also cited a plethora of other state and federal cases, including Texas and 5th Circuit cases in their pleadings, in Roth's motion to Dismiss, in Mims's Motion for Summary Judgment and Roth's corresponding response, and in the parties' proposed findings of fact and conclusions of law. From this, the bankruptcy court could not have concluded that either of the parties was advocating that the laws of Nevada be applied to the case at hand. The court therefore concludes that the choice of law issue was not adequately raised or brought to the bankruptcy court's attention in time to be properly considered, and the bankruptcy court did not did not err in failing to consider the issue. *See Employers Ins. of Wausau,* 978 F.2d at 1430 (a party has "an obligation to call the applicability of another [forum's] law to the court's attention in time to be properly considered"). *Because the choice of law issue was not raised below, the issue was waived, and the court finds no manifest injustice in refusing to decide the issue on appeal.*

■ Moreover, even if the issue had been adequately raised, the court would have nevertheless concluded that any error in applying Texas law was harmless, because neither Texas nor Nevada applies the business judgment rule in cases involving self-dealing or conflicts of interest,[1] and there is sufficient evidence in the record to support the bankruptcy court's finding that Roth secretly negotiated employment with co-defendant Naturade while at the same time negotiating an agreement to sell PNI's assets to Naturade through a bankruptcy proceeding. In doing so, he put his own personal interests and the interests of Naturade above PNI's. Roth's employment negotiations with Naturade

had no business purpose as far as PNI was concerned and the conflict of interest created by Roth's desire to seek employment with Naturade tainted the negotiations and resulting agreement in which Naturade was to buy out PNI. Consequently, the bankruptcy court would have reached the same result and declined to give Roth the protection of the business judgment rule even if it had applied Nevada law.

For the reasons stated, the court concludes that the choice of law issue was not adequately raised below. The court therefore reviews all issues related to the bankruptcy court's findings of fact and conclusions of law under Texas law as did the bankruptcy court.

### D. *Duty of Care*

The bankruptcy court found that Roth owed a fiduciary duty of care to PNI and breached that duty by failing to diligently market PNI's assets; failing to obtain a valuation of those assets; misappropriating corporate funds for personal and other unnecessary expenses; and squandering corporate assets on attorney's fees and settlement claims instead of using PNI's cash to revive the floundering corporation through a Chapter 11 bankruptcy proceeding. Roth contends that he "acted reasonably in furtherance of legitimate business purposes and with the approval of PNI's board of directors," and the bankruptcy court therefore erred in finding that he breached his fiduciary duty of care by: (1) failing to appropriately market PNI's assets to potential buyers other than Naturade; (2) waiting too long to seek bankruptcy protection; and (3) squandering PNI's cash on attorney's fees, settlement of PNI's lawsuits, and Roth's own "high salary and bonus." Roth also contends

---

1. *Compare Buchanan v. Henderson,* 131 B.R. 859, 868 (Nev.1990), *rev'd on other grounds,* 985 F.2d 1021 (9th Cir.1993) and *Resolution* *Trust Corp. v. Acton,* 844 F.Supp. 307, 315 (N.D.Tex.1994).

that Mims waived his duty of care claims at trial by stating "[w]e're not making a claim that they intentionally devalued the company."

 Texas law imposes a duty on the officers and directors to exercise due care in the management of corporate affairs. *Meyers v. Moody,* 693 F.2d 1196, 1209 (5th Cir.1982), *cert. denied,* 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983). The duty of care requires officers and directors to manage the corporation's affairs with diligence and prudence. *Gearhart Indus., Inc. v. Smith Int'l, Inc.,* 741 F.2d 707, 719 (5th Cir.1984). Due care is defined as "that degree of care which a person of ordinary prudence would exercise under the same or similar circumstances." *Meyers,* 693 F.2d at 1209. Texas common law holds interested corporate officers and directors liable for any loss a corporation suffers as a result of negligent mismanagement. *Id.* at 1215. With this in mind, the court considers Roth's arguments that the bankruptcy court erred in finding he breached his fiduciary duty of care.

### 1. Waiver of Duty of Care Claim

 In response to Roth's argument that Mims's duty of care claim was waived at trial, Mims contends that the statement made at trial by Mims's attorney only waived one factual scenario—that Roth intentionally devalued PNI assets. Mims, however, argues that the waiver of that particular claim in no way waives his entire claim against Roth for breach of the fiduciary duty of care, because showing that Roth intentionally devalued PNI assets is only one of many ways of establishing that Roth breached his duty of care. After reviewing the record, the court agrees that Mims only relinquished PNI's claim that Roth intentionally devalued its assets. Accordingly, the court will affirm

the bankruptcy court's determination that Roth breached his fiduciary duty of care if there is other evidence to support its conclusion.

### 2. Failure to Market PNI's Assets and Seek Out Potential Buyers

 Roth contends that the bankruptcy court's finding that Roth failed to identify and seek out buyers for PNI other than Naturade is contrary to the uncontested evidence that he attempted to obtain merger and financing deals for PNI and actively sought buyers for PNI's assets. For support, Roth relies on the following: (1) his testimony that he identified and contacted other potential buyers; (2) his testimony and documentation that he attempted to organize a new company, Healthsource, from which PNI could receive a competing offer to buy its assets; (3) the testimony of former PNI director Tom Pauken and PNI outside director Dean Oakey ("Oakey"), which, according to Roth, establishes that he made efforts to find other buyers; (4) testimony by other witnesses that they did not observe anything in Roth's conduct indicating that he precluded other bidders from competing with Naturade's offer; and (5) and the overall absence of evidence that Roth in fact attempted to preclude other bidders from competing with Naturade.

In its Findings of Fact, the bankruptcy court found Roth to be "one of the least credible witnesses in this case" and found Roth's testimony regarding his failure to seek out other buyers lacking in credibility because of his conflict of interest in negotiating employment with Naturade, which Roth withheld from PNI's board of directors and the bankruptcy court. On the other hand, it appears the bankruptcy court found the testimony of business consultant Jack Stone ("Stone") quite credible, because it accepted his opinion.

Based on letters Roth sent to GNC and Internutria offering Naturade's blending services around the time that PNI filed for bankruptcy, Stone concluded, and the bankruptcy court found, that Roth had "left his post as [PNI's] CEO" and was representing Naturade's interests. Stone expressed the opinion that Roth should have, but failed to market PNI's assets or seek buyers other than Naturade. Roth's evidence to the contrary, regarding Healthsource, can hardly be considered evidence that he diligently marketed and sought alternatives to Naturade's offer, because, as Mims points out and the court agrees, the Healthsource proposal was not prepared until January 20, 1997, the day before PNI filed for bankruptcy. As such, it amounted to no more than a last ditch effort or attempt by Roth to make it appear that he had sought out other buyers.

Roth's reliance on the testimony of Tom Pauken and Oakey to establish that he made efforts to find other buyers is also misplaced. Having reviewed the testimony of these witnesses, it is clear that neither was intimately familiar with the extent of Roth's alleged efforts other than what he had conveyed to them. When asked if Roth sought out other potential buyers, Oakey vaguely testified regarding Roth's efforts and Healthsource, which the court has already addressed. Pauken, who initially agreed that Roth should pursue the proposed deal with Naturade and negotiate on behalf of PNI, later resigned after learning of Roth's employment negotiations with Naturade, because he was convinced that Roth was self-dealing. Consequently, the court finds that this evidence does not support Roth's argument. Likewise, the court finds that Roth's argument that there is no evidence he precluded other buyers from making competing offers is unavailing, because it does not establish that he affirmatively took steps to market PNI's assets and sought out potential buyers other than Naturade.

### 3. Delay in Seeking Bankruptcy Protection

 Roth contends that although Mims's expert believed, and the bankruptcy court concluded, that Roth should have sought bankruptcy protection for PNI between October 15 and November 15, 1996, Roth explained at trial regarding his and the board's reasons for waiting until January. Aside from his own testimony, Roth relies on the testimony of Pauken, who, according to Roth, confirmed that it was the board of director's decision not to seek bankruptcy in October in order to test out Roth's turnaround plan to make PNI profitable. Roth therefore argues that the decision to not file for bankruptcy in October or November of 1996 was reasonable, and the court erred in ignoring Roth's reasons for not seeking bankruptcy protection earlier and finding that his actions were motivated by self-interest.

From this argument, it appears that Roth challenges not so much the sufficiency of the evidence supporting the bankruptcy court's finding, but rather the court's determination as to credibility when presented with contradictory testimony. As stated previously, the bankruptcy court found that Roth's testimony lacked credibility, because the testimony of other witnesses and documentary evidence such as the December 22 letter showed that Roth concealed his employment negotiations from PNI's board of directors and the bankruptcy court. Roth also failed to disclose that Naturade's offer to purchase PNI's assets was for restricted stock, and PNI's bankruptcy attorneys were unaware of the restrictions until shortly before the hearing. The bankruptcy court therefore gave little, if any, weight to Roth's testimony at the February 18, 1996 hearing on

PNI's Emergency Motion to Factor that "he had not been talking to Naturade regarding his employment, and that he had no offer of employment from Naturade."

Because of Roth's concealment, the bankruptcy court apparently gave little weight to Pauken's testimony in which he conceded that agreed PNI should pursue the Naturade deal, because this decision was made without full knowledge of all the facts. As soon as Pauken suspected that Roth was self-dealing or "taking care of himself," he resigned from PNI's board. No minutes from any board meeting, which might mention or reference board discussions or resolutions regarding Roth's conflict or the sale of PNI's assets to Naturade, were presented in this case, and the consent action signed by five out of six directors lacks any reference to Roth's conflict of interest. Accordingly, the bankruptcy court accepted as true Pauken's testimony that he was not presented with any of the documents exchanged between Naturade and Roth regarding Roth's potential employment with Naturade, his testimony that Roth never offered to the board to step aside from negotiating with Naturade so that another director could handle the negotiations despite Roth's assertions to the contrary, and Pauken's forceful testimony that Roth never disclosed the December 22 letter to PNI's board of directors.

For the same reasons, the bankruptcy court found business consultant J. Stone's ("Stone") testimony more credible than Roth's. Stone testified and concluded that based on potential liabilities stemming from, among other things, litigation, consumer complaints, regulatory issues, and

Lewellyn's alleged past deeds, Roth should have sought bankruptcy protection between October 15 and November 15, 1996 when PNI still had approximately $400,000 in cash available to it. Finding no clear error, the court determines that the bankruptcy court did not err in concluding that Roth breached his duty of care by failing to seek the protection of a Chapter 11 bankruptcy proceeding prior to January 21, 1997.

### 4. Misappropriation of Corporate Funds for Personal and Unnecessary Expenses

 Roth argues that the trial court erred in finding that payment of Roth's compensation package, legitimate attorney's fees, and a $100,000 settlement, which was approved by PNI's board of directors, was unreasonable. The court need not address this argument, because there is other evidence to support the bankruptcy court's finding that Roth misappropriated corporate funds, namely, Roth's use of PNI asset's to pay for various personal expenses, which were not disclosed to PNI's board or the bankruptcy court. *See In re Jackson,* 141 B.R. 909, 918 (Bankr.N.D.Tex.1992) (director's use of corporate funds for payment of personal bills found to be breach of fiduciary duty).[2] For all of the reasons stated, the court concludes that the evidence and credibility determination made by the bankruptcy court supports its conclusion that Roth breached his fiduciary duty of care.

### E. *Duty of Loyalty*

Roth contends that the bankruptcy court erred in concluding that he breached his

---

**2.** A misappropriation of funds such as this is more appropriately classified as a breach of the duty of loyalty rather than a breach of the duty of care, because it involves a interested transaction. *See, e.g., GNG Gas Sys., Inc. v. Dean,* 921 S.W.2d 421, 427 (Tex.App.-Amaril-

lo 1996, writ denied) ("when a corporate officer or director diverts assets of the corporation to his own use, he breaches a fiduciary duty of loyalty to the corporation, and the transaction is presumptively fraudulent ....") (internal citations omitted).

fiduciary duty of loyalty, because: (1) potential employment does not constitute a conflict of interest or interested transaction; (2) any conflict of interest was adequately disclosed to PNI's board of directors; and (3) the proposed sale of PNI's assets to Naturade was fair.

■■■■■ The relationship of officers and directors to a corporation is a fiduciary one imposing upon them the duty to exercise their powers as officers and directors solely for the benefit of the corporation and its stockholders. *Duncan v. Lichtenberger*, 671 S.W.2d 948, 952 (Tex.App.-Fort Worth 1984, writ ref'd n.r.e.) (quoting *Canion v. Texas Cycle Supply, Inc.*, 537 S.W.2d 510, 513 (Tex.Civ.App.-Austin 1976, writ ref'd n.r.e.)). Implicit in this duty is that a director or officer will not exercise his power to serve his own personal interest at the expense of the corporation and its stockholders. *Id.* The duty of loyalty requires that officers and directors act in good faith and not allow their own personal interests to prevail over the interests of the corporation; this duty forbids them from engaging in "interested" transactions. *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 719 (5th Cir.1984). A director engages in an "interested" transaction if he transacts business in his director's capacity with a second corporation of which he is also a director or has a significant financial interest or does business for the corporation with a family member. *See id.* at 719–20. Put another way, interested transactions include those in which directors personally profit from the transaction or those which deprive the corporation of a profit opportunity. *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex.1963). Whether a director is "interested" is a question of fact. *Id.* at 576. The burden of proof is on the interested director to show that the challenged action is fair to

the corporation. *Gearhart*, 741 F.2d at 720. An interested transaction may nevertheless be valid if (1) the material facts of the relationship or interest are disclosed and the transaction is approved by a majority of the disinterested directors; or (2) disclosed to the stockholders entitled to vote and specifically approved in good faith by a stockholder vote; or (3) the transaction is fair to the corporation at the time it is authorized, approved, or ratified by the board of directors. Tex. Bus. Corp. Act. art. 2.35–1(A)(1)–(3) (Vernon Supp.2002).

### 1. Roth's Employment Negotiations with Naturade

■■■■■ Roth first contends that his employment negotiations with Naturade did not constitute a conflict of interest. For support, he cites *Mitchell v. Highland–Western Glass Co.*, 19 Del.Ch. 326, 167 A. 831 (Del.Chan.1933). He also argues that the transaction to sell PNI's asset to Naturade was not an interested transaction, because he would have received a lower salary with PNI, he would not have received any of PNI's assets from the transaction, he had no ownership or other financial interest in Naturade, and he had no family members associated with Naturade. The court disagrees.

Roth's assertion that he no financial interest in the sale of PNI assets to Naturade is not supported by the record. To entice Roth, Naturade offered him more than just a salary. The agreed upon compensation package included commissions on the sale of PNI products through GNC, stock options, and a management role as an officer of PNDN. The terms of Roth's compensation package thus were directly tied to the sale of PNI's assets to Naturade. The court therefore finds that Roth had every reason to be "interested" in the proposed sale of PNI's assets to Naturade. Moreover, the case cited by Roth is distin-

guishable from the present case, because officers of the seller in that case were not approached by the buyer until *"after* the sale" of the corporation's assets. *Id.* at 329, 167 A. 831 (emphasis added). Here, the opposite took place in that Naturade approached Roth *before* the sale of PNI's assets, and, as stated previously, the terms of Roth's employment were directly tied to the sale of PNI's assets to Naturade. *Mitchell v. Highland Western Glass* is therefore inapplicable.

### 2. Disclosure of Roth's Conflict of Interest

Roth next contends that even if his employment negotiations with Naturade constituted a conflict of interest, it did not amount to a breach of the duty of loyalty, because he did not hide his potential interest in the Naturade transaction, and there was no "secret deal." For support, Roth points to evidence that the board of directors was aware of his employment negotiations with Naturade and decided that, in spite of his potential conflict of interest, he was best suited to negotiate the transaction to sell PNI's assets to Naturade. Roth also maintains that after discussing his conflict of interest, the PNI board voted in favor of the Naturade proposal, authorizing him to commence bankruptcy. The court again disagrees.

Beginning first with Roth's argument that there was no "secret side-deal," Roth does not contend that there is insufficient evidence to support the bankruptcy court's finding that his employment negotiations and agreement with Naturade were kept secret. Rather, he attacks the bankruptcy court's finding on the basis that the court overlooked much of the contrary evidence, which according to Roth, overwhelmingly established there was no secret side-deal. Roth acknowledges, however, that the bankruptcy court's finding boiled down to its determination of witness credibility. The bankruptcy court specifically stated in its findings why it found certain witnesses credible and others lacking in credibility. The trial court is in a far superior position to determine the credibility of witnesses and the weight to be accorded such testimony. The court therefore declines to disturb the bankruptcy court's findings as to credibility or its finding that Roth's employment negotiations with Naturade were kept a secret.

Even if the court were to accept Roth's version of the evidence regarding the existence or non-existence of a secret side-deal, it still concludes that Roth breached his duty of loyalty, because the evidence that he relies upon does not support his argument that he adequately disclosed the conflict of interest.[3] Conspicuously absent

3. This is one of many instances in which Roth mischaracterizes the record. As evidence that he adequately disclosed his employment negotiations with Naturade and the related conflict of interest, Roth asserted that two PNI independent directors, Tom Pauken ("Pauken") and Dean Oakey ("Oakey"), testified that the board of directors knew Roth would probably end up being employed with Naturade. Pauken testified he thought Roth might end up working for Naturade, but it was not because Roth had disclosed his employment negotiations with PNI's board of directors. In fact, Pauken testified to the contrary, that is, he resigned from the board, because he had unconfirmed suspicions that

Roth was self-dealing. Pauken also testified, and the court found, that (1) Roth never disclosed any potential employment with Naturade; (2) Pauken was not presented with any of the documents exchanged between Naturade and Roth that implicated Roth's potential employment with Naturade; and (3) Roth did not disclose the December 22 letter to PNI's board. Oakey's testimony, on the other hand, supported Roth's version of the facts. Roth criticized the bankruptcy court for discrediting Oakey's testimony; however, Roth failed to mention why the bankruptcy court found Oakey's testimony lacking in credibility. The bankruptcy court discredited Oakey's

from the record is any PNI board minutes of meetings at which the board allegedly discussed Roth's conflict of interest or the sale of PNI's assets to Naturade. None of PNI's directors testified that Roth disclosed his employment negotiations with Naturade or that the board had discussed the matter. Without full knowledge of Roth's conflict of interest, PNI's board could not have approved or ratified Roth's proposal to sell PNI's assets to Naturade. *See* Tex. Bus. Corp. Act. art. 2.35–1(A)(1)–(3). For the same reason, the board could not have made an informed decision whether Roth was the right person to negotiate a deal with Naturade on behalf of PNI. *Id.* Even if the court determined that PNI's board of directors had ratified the interested transaction, this would not necessarily extinguish Mims's claim for breach of loyalty, but instead would merely shift the burden to Mims to prove that the disputed transactions were actually unfair. *Weaver v. Kellogg*, 216 B.R. 563, 582 (S.D.Tex.1997).

### 3. Fairness of Naturade's Proposal

 Roth contends that he did not breach his duty of loyalty, because Naturade's offer to buy PNI's assets was fair to PNI despite any conflict of interest. Roth argues that the transaction was fair, because: (1) although Mims's expert, James Travis ("Travis"), testified that PNI's assets were worth $2,049,000, this testimony

was discredited by Naturade's expert, Scott Hakala ("Hakala"), who testified that Naturade's offer of $1,505,000 exceeded the value of PNI's assets by $1,504,000; (2) Naturade's proposal turned out to be more valuable than predicted at the time of the offer; (3) he handled the negotiations single-handedly and fought for and obtained concessions from Naturade; (4) PNI's board knew about his potential conflict regarding employment negotiations and even assumed that he would probably work for Naturade after the transaction was complete; and (5) Naturade was the most logical buyer, because it distributed PNI's products and was familiar with its operations and had the most to lose if PNI stopped operating.

None of these arguments or the evidence presented by Roth establishes that the interested transaction was fair to PNI. Evidence that Roth fought hard, even if taken as true, does not establish that the transaction was fair to PNI. Similarly, whether Naturade was the most logical buyer and had the most to lose only goes to show that the deal was fair to Naturade, not PNI. Evidence that Naturade's proposal turned out to be more valuable than predicted does not establish that the proposal was "fair at the time it is authorized, approved, or ratified by the board of directors," Tex. Bus. Corp. Act. art. 2.35–1(A)(3). Moreover, the court already determined that Roth failed to disclose his

testimony, because Oakey admitted to reading a transcript of Roth's testimony that he had received from Naturade's attorney before testifying. The bankruptcy court concluded that Oakey's testimony that he had reviewed the December 22 letter at a board meeting when he first met PNI's St. Louis attorney was not worthy of consideration, because Tom Newmark ("Newmark") and Kerth were PNI's only St. Louis attorneys; however, the only board meeting attended by Newmark was on December 18, 1996, which was four days before the December 22 letter was drafted,

and Kerth admittedly did not attend any board meetings. The court notes that Roth's appellate brief is replete with mischaracterizations such as this, so many that the court could not possibly list or point them all out. He makes statements or assertions that plainly mischaracterize or embellish the evidence in an effort to support his arguments; however, in virtually all instances checked by the court, the evidence is not susceptible to the interpretation or construction he seeks to ascribe to it.

conflict of interest and the material terms of the deal, that is, that the offer was for *restricted stock*. The board thus could not have approved or ratified Roth's proposal to sell PNI's assets to Naturade. Even if the board approved of the transaction, it could not have determined whether the transaction was fair to PNI at the time of approval, because Roth failed to disclose his conflict of interest and that the offer was for restricted stock.

Finally, regarding Roth's argument that Naturade's offer exceeded the value of PNI's assets, PNI bankruptcy attorney Kerth testified that Naturade's non-cash offer of restricted Naturade stock was not as good as a cash transaction.[4] Kerth even cautioned Roth that it would be difficult to get a bankruptcy court's approval of the non-cash stock transaction and that § 363 sales were generally not favored, especially during the early stages of a bankruptcy proceedings. PNI attorney Portman testified that he told Roth that courts in the Fifth Circuit generally disfavored bankruptcy sales and that there was a 95 percent chance that an emergency motion and sale like the one proposed by Smith and Naturade would be denied. Portman also advised Roth in the presence of Smith that there should be a plan or alternative bidding procedures in place. Smith, however, made it quite clear that Naturade had no interest in doing a plan. Without a plan or cash, the only alternative was Chapter 7 liquidation if PNI's emergency motion failed. Roth was therefore aware of the likely consequence of pursuing Naturade's proposal in the context of an emergency sale.

In addition, Portman discussed at length with Roth the fiduciary duty of an officer and director and explained to Roth that his fiduciary duty was not to PNI's creditors but to its shareholders. During this same conversation, Portman expressed his view that Naturade's proposal was not in the best interest of PNI's shareholders. Roth, nevertheless, pushed forward with the deal despite Portman's and Kerth's misgivings and advice to the contrary.

As for the differing views of the parties' experts, the bankruptcy court found, and the court agrees, that Hakala's opinion and his estimate of the value of PNI's assets were flawed in that they did not account for PNI's brand equity, trademarks, or customer base. The evidence shows that this is what interested Naturade the most and, according to PNI strategic expert Joe Palo, would have likely interested other strategic buyers in PNI's product line. Palo estimated that a strategic buyer would be willing to pay $3 to $5 million for PNI's core business, absent liabilities, because liabilities can be reorganized in a Chapter 11 proceeding.

The bankruptcy court also found, based on Palo's testimony, that a potential buyer would be willing to pay more for business assets that were in operation than for business assets that were sold after the business had closed down, even though the assets were essentially the same, because the asset sale process yields higher value from a business and assets in operation than from a business and assets in liquidation. Neither Naturade nor Roth offered any expert witness to rebut Palo's assessments and opinions. The court therefore determines that Roth failed to meet his burden of establishing that the interested transaction was fair to PNI.

---

4. There is no evidence that Roth ever disclosed to PNI's board that Naturade's offer was for restricted stock. Even PNI's attorneys were unaware of this fact until shortly before the bankruptcy court's February 19, 1997 hearing on PNI's § 363 Emergency Sale Motion and Naturade's corresponding offer.

## F. *Damages and Costs*

Roth raises a number of issues regarding the bankruptcy court's award of damages and costs: (1) the bankruptcy court applied the wrong remedy and measure of damages, and relied on speculative and incompetent evidence; (2) the bankruptcy court erred in awarding excessive punitive damages; (3) the bankruptcy court failed to give Roth a credit based on settlement sums paid to Mims by a co-defendant; and (4) and the bankruptcy court improperly awarded costs to Mims.

### 1. Measure of Damage Award and Supporting Evidence

Roth argues that the bankruptcy court erred in awarding damages to Mims because: (1) the bankruptcy court applied the wrong remedy; (2) the bankruptcy court's conclusion that damages for breach of fiduciary duties include "any loss" is too far reaching; (3) the court erred in holding him liable for damages subsequently caused by the trustee's intervening actions; (4) the bankruptcy court erred in measuring PNI's value as a going concern against the liquidation value; and (5) the bankruptcy court's award is based on speculative and incompetent evidence.

### (a) Appointment of Trustee as Remedy

Roth first contends that the appropriate remedy for a current manager's fraud, dishonesty, incompetence, or gross mismanagement of a debtor's affairs before or after the commencement of a case is appointment of a trustee. He therefore argues that even if he breached his fiduciary duties, appointment of a trustee in this case was an appropriate and sufficient remedy. Accordingly to Roth, even if his proposed sale of PNI assets to Naturade was procured through self-dealing or a "sweetheart deal," PNI suffered no harm, because, the bankruptcy court rejected the deal, terminated Roth, and appointed Mims as PNI's trustee. In response, Mims argues that Roth waived this issue by failing to present it to the trial court. Alternatively, Mims argues that appointment of a trustee is not the only remedy available in cases involving breach of fiduciary duties.

 Before addressing the parties' arguments, the court first notes that Mims correctly asserts that Roth failed to present this argument to the bankruptcy court. Ordinarily, a appellate court will not review claims raised for the first time on appeal. *Vogel v. Veneman,* 276 F.3d 729, 733 (5th Cir.2002). There is no basis for an exception in this case. *See F.D.I.C. v. Lee,* 130 F.3d 1139, 1141–43 (5th Cir.1997) (affirming summary judgment on statutory ground raised by appellee for first time on appeal). *Hill v. City of Pontotoc,* 993 F.2d 422, 426 (5th Cir.1993) (court declined to consider City's argument that reinstatement and front pay, its surrogate, are appropriate remedies for a purely procedural due process violation where City did not make argument below). The court therefore declines to consider Roth's argument that appointment of a trustee in this case was an appropriate and sufficient remedy for breach of fiduciary duties.

### (b) Damage Award for "Any Loss"

Roth contends that the bankruptcy court's conclusion that damages for breach of fiduciary duties include "any loss" is too far reaching, because the Fifth Circuit in *Meyers v. Moody,* 693 F.2d 1196, 1214 (5th Cir.1982), *cert. denied,* 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983) did not permit the plaintiff to recover any loss, but instead only permitted recovery of any loss the plaintiff may have suffered as a result of the defendant's neglect. Contrary to Roth's assertion, the bankruptcy court

concluded that "[d]amages for breach of fiduciary duty include a company's lost marketability, but have also been described as 'any loss' ... *resulting from the breach* ... including consequential damages ...." (emphasis added). The court therefore finds that the bankruptcy court did not misconstrue the rule set forth in *Meyers v. Moody*.

### (c) Intervening Cause of Damages

In a related argument, Roth contends that any loss in value of PNI's assets was not caused by his conduct but rather Mims's decision to liquidate rather than operate and reorganize PNI. In other words, he contends that the action taken by Mims was an intervening cause that severed any causal link between his actions and PNI's damages. Roth therefore maintains that the bankruptcy court erred in holding him liable for losses resulting from Mims's conduct after his employment with PNI was terminated and Mims was appointed as PNI's bankruptcy trustee. Roth even suggests that the bankruptcy court admitted as much during the trial of this case. The court disagrees.

First, the court disagrees that the statement made by the bankruptcy court amounts to an admission of any kind. The following exchange took place between the court and defense counsel Charles Gall ("Gall"):

Court: It seems that a lot of what you're asking I'm not sure is relevant.

. . . . .

Gall: The number that they're trying to use is the bottom line for their damages is the amount that was bid at the sale. And they're contending that the assets were worth apparently a lot more than that. And their own expert, Mr. Palo, said if thousands of notices went out and nobody came in and bid, that would alter his opinion of the value of the assets. And I'm simply trying to close that loop that, in fact, thousands of notices were sent out and only two people came in to bid.

Court: I don't think there's a relationship between what happened in this case and I'll decide all of that and the sale in a bankruptcy Chapter 7 auction. The causative effect and so forth is missing. When you get to the time of a Chapter 7 auction, it's a different situation.

Gall: Even though all the testimony is that these assets can only be sold in some kind of Chapter ...

Court: Well, the body is in worse shape than it was before.

Gall: All right.

Court: I'll let you go ahead, but you're beating a dead horse.

From this, the court concludes that although the bankruptcy court stated that "the body is in worse shape than it was before," it did not state, as Roth suggests, that it was in worse shape as a result of Mims's conduct. Moreover, when read in the context of the entire proceedings, it is clear that the bankruptcy court did not intend by this statement that Mims was the cause of PNI's financial demise. Rather, the bankruptcy court concluded that PNI's financial situation was caused by Roth's self-dealing and conflict of interest. The bankruptcy court specifically found that when Roth began acting as PNI's CEO, president, and board chairman on August 29, 1996, PNI had between $600,000 and $700,000 in cash or equivalents; however, by the time Mims was appointed on January 19, 1997, PNI had only $40,000 in cash remaining, no employees, no operations, and PNI was unable to fill a $325,000 order placed by GNC, one of PNI's largest and most valuable custom-

ers. The bankruptcy court therefore concluded that a liquidation sale of PNI's assets was Mims's only *option after PNI* declared bankruptcy on January 21, 1997.

The bankruptcy court attributed PNI's depletion in cash reserves to Roth, finding that Roth not only squandered and mismanaged PNI's cash by using it to pay for personal expenses and certain company expenses that had less priority, but also failed to disclose to PNI and the bankruptcy court that he used PNI assets to pay the following: (1) $325,000 to Naturade within ninety days of bankruptcy; (2) $100,000 on December 10, 1996 to settle a lawsuit; (3) payments to Roth's wife's travel agency; (4) payments to Roth's brother's law firm; (5) payments for Roth's personal moving expenses; and (6) payments for Roth's health club fees and dues. Based on this and numerous other inconsistencies in his trial testimony, the bankruptcy court found Roth the least credible of all the witnesses who testified.

The bankruptcy court also found that in late November or early December 1996, when Roth began discussing the option of selling PNI's assets to a third-party buyer under the protections of a bankruptcy proceeding, Roth should have made a good faith attempt to find potential bidders or buyers other than Naturade, but failed to do so despite warnings from PNI's lawyers. The bankruptcy court attributed "Roth's failure to act in this respect" to "his self-interest in employment with Naturade—a conflict of interest—and the influence of Naturade in the process of wrecking PNI" and held Roth liable for damages it determined were directly traceable to Roth's conduct as well as damages for PNI's lost marketability and consequential damages resulting from Roth's breach of fiduciary duties.

Although Roth points to evidence that the $100,000 paid to settle a lawsuit was approved by the board of directors, this in and of itself would not make the bankruptcy court's determination clearly erroneous, because there is other evidence to support the court's conclusion that Roth breached his fiduciary duty and there is no requirement that the damage award need be calculated with exact precision. *See Dyll v. Adams*, 167 F.3d 945, 946–947 (5th Cir. 1999). Accordingly, the court concludes that the bankruptcy court did not err, because, contrary to Roth's assertion, it only held him liable for damages resulting from his own breach of fiduciary duties.

### (d) Evidence Supporting Court's Award

Roth contends [5] that: (1) the bankruptcy court erred in measuring PNI's value as a going concern against the liquidation value of its intangible assets and argues that the evidence supporting the bankruptcy court's award is speculative and incompetent; (2) the premise underlying Mims's claim for damages, that another buyer would have paid more for PNI's assets than Naturade, is conjectural, because there is no evidence of any other potential buyer; (3) the valuation evidence of PNI's assets provided by Travis, Mims's expert, and relied on by the bankruptcy court is speculative and incompetent—in part, because Travis did not follow the professional methods and requirements that he conceded govern his work; (4) the going concern value of PNI's assets was not

---

5. Similar to his other points of error, Roth presents a number of multifarious arguments, making it difficult if not impossible to summarize and address each of his contention or assertions in a cohesive manner. The court therefore simply lists as best as possible, but not in any particular order, what it perceives to be all of his contentions regarding this issue.

$2,049,000 as projected by Travis, but actually less than $500,000 as determined by Naturade's expert Hakala. Mims responds that Travis's expert opinion and valuation established the value of PNI's product line if sold to a willing buyer in the relevant industry at or around the time that Roth realized bankruptcy was necessary and began dealing with Naturade, and the valuation evidence supports the bankruptcy court's award of damages.

Texas law requires that damages be established with a reasonable degree of certainty. *Dyll,* 167 F.3d at 946–947. "The damages must be ascertainable in some manner other than by mere speculation or conjecture, and by reference to some fairly definite standard, established experience, or direct inference from known facts." *Richter S.A. Inv. v. Bank of America Nat'l Trust and Savings Assoc.,* 939 F.2d 1176, 1188 (5th Cir.1991). In other words, the "damages need not be established with mathematical precision, [but] the evidence must provide a basis for reasonable inferences." *Dyll,* 167 F.3d at 947. "Uncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery." *Id.* (quoting *McKnight v. Hill & Hill Exterminators,* 689 S.W.2d 206, 207 (Tex. 1985)).

When boiled down, Roth's argument is that there is uncertainty as to the amount of damages. Thus, the evidence need not be established with mathematical precision. The evidence supporting damages need only provide a basis for reasonable inferences. With this in mind, the court addresses Roth's arguments regarding the valuation evidence and the bankruptcy court's findings regarding this evidence.

At trial, Travis testified on behalf of Mims, and Hakala testified for Naturade. Roth presented no expert testimony. The record reflects that Travis testified regarding the value of PNI's assets as of December 10, 1996 and specifically stated that his valuation complied with the American Society of Appraisers' standards and that in cases such as this where historical financials were unreliable, other measures were required to develop the valuation, including analysis of relevant public markets. In preparing his "going concern" valuation, Travis used the "income approach" in which he projected PNI's future revenues and then discounted that amount to come up with a present value. To do this, Travis considered PNI's working capital, machinery, equipment, and intangible assets and assumed that PNI's core business assets would continue to be operated rather than liquidated. Using the Hatamyar valuation report ("Hatamyar Report"),[6] the Roth's Action Plan,[7] and PNI's revenues as of December 10, 1996, Travis projected 1997 operating revenues of $3.6 million.

6. At Roth's request, the Hatamyar Report, a fair market valuation report, was prepared for Naturade in May of 1997 by William Hatamyar, a former PNI financial consultant. The purpose of this report was to provide an estimate of PNDN's fair market value based on market conditions existing in May 1997. The report states that cost, market, and income approaches are commonly accepted methods for valuing closely held businesses and estimates the going concern value for PNDN at $1,700,000. To arrive at this valuation, the Hatamyar Report accepted as true PNI's income under Roth's management for September, October, and November of 1996, which was estimated at $1,090,000, and assumed that PNI's revenues for this period were historical for purposes of estimating its 1997 revenues as a Division of Naturade. The report projected 1997 revenues at $3.5 million.

7. Roth projected revenues of $5 million and sales of $6.1 million as of February 14, 1997 in his Action Plan for PNI as a division of Naturade.

Travis testified that because his valuation was based on a discounted cash flow income approach, PNI's business and beneficial relationship with GNC were not fully accounted for in his valuation. He also increased the discount rate that he used from 16 to 20 percent to account for the possibility that PNI might not achieve the projected cash flows. Travis estimated that a buyer looking for a market entry into GNC would likely be willing to pay over $2,049,000 for PNI's assets.

Naturade offered the expert testimony of Hakala to rebut Travis's valuation of $2,049,000. Hakala, however, did not offer a competing valuation of PNI's assets, because he had not prepared a valuation of his own. Instead, he chipped away at Travis's $2,049,000 estimate by deducting from that value for working capital, capital expenditures, and what he referred to as PNI's distressed state. Hakala's proposed deductions totaled $1,786,750, leaving an approximate estimated value of only $262,250. Hakala likened the assets from PNI's product line to a "wildcat oil well," and expressed the opinion that any offer in December 1996 or January 1997 would have been fair, considering PNI's distressed state and liabilities.

The bankruptcy court rejected Hakala's testimony and proposed reductions, reasoning that PNI was not capital intensive and even if it was, a prospective buyer of PNI's assets could have had sufficient funds on hand for working capital purposes, borrowed funds, or operated the company with a low level of working capital. The bankruptcy court further concluded that capital outlay for manufacturing, blending equipment, or property was not necessary, because PNI did not blend its own product, and neither Naturade nor Roth introduced any evidence to support Hakala's opinion regarding a need to acquire substantial property, plant equip-ment, or other capital. Finally, the bankruptcy court disagreed with Hakala's opinion that PNI's "distressed state" would affect the value of its assets, because it determined that the highest value of PNI's operating assets could have been realized by separating its assets from the distressed nature of the corporation itself through a Chapter 11 reorganization.

On the other hand, The bankruptcy court accepted the testimony of Travis, because Travis's "projected revenues closely paralleled and complimented the projected revenues for PNI's first year of operation under Naturade in the Hatamyar Report." The court also found Travis's and Hatamyar's revenue projections to be conservative, since both projections were far less than the $5 million in projected revenues and $6.1 million in projected sales set forth in Roth's Action Plan.

In addition, the bankruptcy court found that Travis's valuation estimate of PNI's assets was supported by Palo's testimony and his "build or buy" analysis. Palo estimated that PNI spent approximately $7 million from 1991 through 1996 on advertising, which built up brand equity in PNI's product line. Palo expressed the opinion that for another company to develop this same level of brand equity, it would need to make similar expenditures on marketing. Palo therefore opined that a prospective buyer would be willing to pay between $3 and $5 million for PNI's core business, absent its liabilities, because this amount is less than it would have to expend to replicate PNI's brand equity.

In arriving at this amount, Palo discounted PNI's liabilities, reasoning that liabilities can generally be reorganized in a Chapter 11 bankruptcy proceeding as less cost. He also testified that potential buyers are generally willing to pay more for business assets that are in operation than for business assets that are sold after a

business has ceased operating. He therefore concluded that PNI's assets would have yielded a higher value if they were sold through the sale process while the business was still operating rather being than liquidated after operations had ceased.

Based on its findings, the bankruptcy court obviously chose to believe the expert testimony of Travis over that of Hakala. In making this determination, the court considered the qualifications of both experts, although not contested, their testimony, demeanor, the methodology and principles used, and found Travis's testimony more reliable and consistent with other evidence and testimony presented at trial, including the projections set forth in Roth's own Action Plan. The trial judge is in a far better position than the reviewing court to assess the testimony of each expert witness and to observe witness demeanor and the manner in which each witness testifies in making a determination as to credibility or believability of testimony and the weight to be accorded such testimony. Accordingly, deference must be given to the bankruptcy court's findings unless the reviewing court determines that the findings are clearly erroneous. In light of the record and deference that must be given the bankruptcy court, the court cannot say that the bankruptcy court's findings regarding damages are clearly erroneous or without adequate support.

### 2. Punitive Damages

 Roth argues the bankruptcy court erred in awarding punitive damages, because Texas law requires evidence of malice and there is none here. Alternatively, Roth contends that even if an award of punitive damages is justified, the bankruptcy court's award of $1,000,000 is excessive, because Texas law requires that the amount of exemplary damages assessed be proportionate to the amount of actual damages. For support, Roth cites *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908 (Tex. 1981). Mims, on the other hand, argues that based on the evidence and the flagrant and intentional nature of Roth's actions, the bankruptcy court's award was not excessive. The court agrees.

In Texas, exemplary damages may be awarded if there is clear and convincing evidence that the harm caused results from: "(1) fraud; (2) malice; or (3) wilful act or omission ..." *See* Tex. Civ. Prac. Rem.Code Ann. § 41.003 (Vernon 1997). Section 41.001 defines malice as:

(A) a specific intent by the defendant to cause substantial injury to the claimant; or

(B) an act or omission:

(i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

§ 41.001. Although Roth maintained at trial and on appeal that "he did not maliciously try to harm PNI, but worked tirelessly to try to improve it," the bankruptcy court found by clear and convincing evidence that:

Roth behaved with malice in conspiring with Naturade to sell PNI's assets to Naturade, and in not properly marketing PNI's assets.... Both Roth and Naturade behaved in such a way that their actions, when viewed objectively from the standpoint of Roth and Naturade at the time of the tortious interference and at the time of their acts of civil conspiracy, involved "an extreme

degree of risk, considering the probability and magnitude of the potential harm to" PNI, its stockholders, its creditors, and the bankruptcy estate of PNI. Roth and Naturade had "actual, subjective awareness of the risk involved, but nevertheless [proceeded] with conscious indifference to the rights" of PNI, its shareholders, its creditors, and the bankruptcy estate of PNI. Bankruptcy Court's Amended Findings of Fact and Conclusions of Law at 35 (internal citations omitted). From this, the court finds no clear error and concludes that the evidence and credibility determination made by the bankruptcy court supports its finding that Roth acted with malice.

After reviewing the case cited by Roth, which does not stand for the proposition asserted, the court also determines that the bankruptcy court's award of $1,000,000 falls within the exemplary damage cap imposed by Chapter 41 of the Texas Civil Practices & Remedies Code, which provides that "[e]xemplary damages awarded against a defendant may not exceed an amount equal to the greater of: two times the amount of economic damages; plus an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or $200,000." § 41.008. Moreover, given the flagrant and self-interested nature of Roth's conduct, his apparent disregard for PNI's welfare, and the numerous material nondisclosures to PNI and the bankruptcy court, the court concludes that the bankruptcy court's award of $1,000,000 in punitive damages is appropriate and reasonable in relation to the $1.7 million in actual damages awarded. Such amount is necessary to serve as a punishment for Roth and as a deterrent to him and others who may be inclined to engage in the same conduct. Accordingly, the court finds no error.

### 3. Credit Based on Settlement

 Roth contends that he is entitled to a credit of $340,000 based on the settlement proceeds Naturade paid Mims. Mims, on the other hand, argues that Roth waived this issue by failing to raise it below. Mims also argues that Roth provided no evidence related to the Naturade settlement, the settlement amount, or the credit amount requested from which the court could determine that Roth is entitled to a credit requested. Alternatively, Mims contends that if Roth is entitled to a credit, little of the settlement paid by Naturade should be credited to Roth, because only part of the Naturade settlement was allocated to satisfy Naturade's joint and several liability with Roth.

After carefully reviewing the record, the court finds that Roth is precluded from raising this argument, because he failed to assert it before the bankruptcy court. Only in cases of "extraordinary circumstances" does the court consider issues raised for the first time on appeal that were not previously raised "to such a degree that the trial court may rule on it." *N. Alamo Water Supply Corp. v. City of San Juan,* 90 F.3d 910, 916 (5th Cir.1996); *see Cormier v. Oceanic Contractors, Inc.,* 696 F.2d 1112, 1113 (5th Cir.) (court declined to address issue of whether employer was entitled to a settlement credit where employer had failed to raise the argument below and any error was not plain), *cert. denied,* 464 U.S. 821, 104 S.Ct. 85, 78 L.Ed.2d 94 (1983). Moreover, Roth presented no evidence from which the court could determine that he was entitled to a credit in the amount of $340,000.

### 4. Taxation of Costs

 Finally, Roth contends that the bankruptcy court improperly awarded costs to Mims. Specifically, Roth contends

that: (1) the trial court was divested of jurisdiction to award costs after Roth filed his notice of appeal; (2) Mims waived his right to seek costs; and (3) the costs sought are not allowable under 28 U.S.C. § 1920. Mims argues that any objections Roth had to the costs allowed by the bankruptcy court were waived by his failure to timely respond as required by Federal Rule of Bankruptcy Procedure 7054. In his reply, Roth suggests that because the bankruptcy court never formally ruled on the objections he raised in his motion regarding costs, the objections were deemed denied for purposes of appeal. The court disagrees.

■ Since federal courts are forums of limited jurisdiction, the court first addresses whether the bankruptcy court had jurisdiction to consider Mims's motion for costs, filed April 21, 1999, in light of the Roth's prior appeal on April 1, 1999. As a general rule the effective filing of a notice of appeal transfers jurisdiction from the district court to the court of appeals with respect to all matters involved in the appeal. *See Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58–59, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982) *(per curiam); Newball v. Offshore Logistics Int'l*, 803 F.2d 821, 825 (5th Cir.1986). This general rule however is not absolute. *See Thomas v. Capital Sec. Serv., Inc.*, 812 F.2d 984, 987 (5th Cir.1987) ("[E]ven though the judgment on the merits has been properly appealed and is pending in the courts of appeal, the district court retains jurisdiction to entertain and resolve a motion requesting attorney's fees or sanctions."), *vacated in part, reinstated in part*, and *remanded on other grounds*, 836 F.2d 866 (5th Cir.1988) *(en banc)*. One well recognized exception is that even though the judgment on the merits has been properly appealed and is pending in the courts of appeal, the district court retains jurisdic-

tion to entertain and resolve a motion on matters collateral to the merits of the action. *Procter & Gamble Co. v. Amway Corp.*, 280 F.3d 519, 524–25 (5th Cir.2002); *see also Buchanan v. Stanships, Inc.*, 485 U.S. 265, 268, 108 S.Ct. 1130, 99 L.Ed.2d 289 (1988) (concluding that a Rule 54(d) motion for costs raises issues wholly collateral to the judgment in the main cause of action.).

■ In the present case, Mims filed his application for costs under Fed. R. Bankr.P. 7054. Like Fed.R.Civ.P. 54, assessment of costs under Rule 7054 does not involve reconsideration of any aspect of the decision on the merits; the "prevailing party" automatically is entitled to costs "unless the court otherwise directs." *Compare id.* and Fed.R.Civ.P. 54(d); *see Buchanan*, 485 U.S. at 268, 108 S.Ct. 1130. Indeed, the Rule contemplates that applications for costs will be presented in the first instance, not to the court, but to the clerk; a district judge need not take up the issue at all unless the losing party makes a timely motion for judicial review. *Id.* ("On motion served within 5 days [after the clerk's taxing of costs], the action of the clerk may be reviewed by the court."). The court therefore rejects Roth's argument that the bankruptcy court lacked jurisdiction to entertain Mims's motion for costs. The court also determines that Mims did not waive his right to seek costs, because Rule 7054 imposes no time limitations for when a party may seek costs.

The court turns next to Mims's argument that Roth waived any objections he may have had to the costs allowed by the bankruptcy court by failing to timely respond as required by Federal Rule of Bankruptcy Procedure 7054. As stated previously, the bankruptcy court's authority to review the taxation of costs arises from Rule 7054, and costs are reviewable by the bankruptcy court provided a motion

is filed within five (5) days of the taxation of costs. *Id.; see also* Fed.R.Civ.P. 54(d)(1) (same). Mims maintains that he filed his application for costs on April 21, 1999, that the bankruptcy court awarded costs in his favor on May 21, 1999, and Roth filed a motion objecting to the award of costs on June 7, 1999, seventeen (17) days after the court granted his application for costs. Roth, on the other hand, does not provide any relevant dates, but argues that the dates provided by Mims are incorrect.

Having reviewed the record, the court determines that Mims filed his application for costs on April 21, 1999, the bankruptcy court granted Mims's application on May 21, 1999 and directed the clerk to tax costs in the amount of $125,326.43 in favor of Mims, and Roth joined Naturade's motion objecting to the award of costs on June 11, 1999. Although there is no entry on the docket sheet that reflects the date the clerk actually taxed the costs, Mims appears to contend that the relevant date is April 21, 1999 while Roth appears to rely on May 21, 1999.

Roth made no assertion in his brief as to when he believed costs were taxed by the clerk; however, in his July 11, 1999 motion to the bankruptcy court, Roth joined Defendant's Naturade's Motion Under Fed. R.Civ.P. 60(b) and 59(e) to Vacate or Alter Default Order Allowing Costs, filed on June 6, 1999, in which Naturade asserted that costs were awarded the same day it filed its Response in Opposition to Application to Tax Costs and Bill of Costs by Jeffrey H. Mims, which was filed on May 21, 1999.

Regardless of whether costs were taxed on April 21, 1999 or May 21, 1999, Naturade's motion objecting to costs was far from timely and Naturade failed to show that its failure to timely file the motion was the result of excusable neglect. Roth acknowledges in his reply that Naturade's motion was untimely. His attempt to ride piggyback on Naturade's objections is therefore unavailing. Roth's failure to file his motion within five days of the taxation of costs waived any right he had to complain about costs under Rule 7054. As a result, Roth is not entitled to object on appeal to the bankruptcy court's award of costs and the court disregards his objections related to this issue. Accordingly the court need not address Roth's issue of whether the costs sought by Mim were allowable under 28 U.S.C. § 1920.[8]

## IV. *Conclusion*

For the reasons stated herein, the judgment of bankruptcy court is in all respects affirmed. Pursuant to Rule 8016(a) of the Federal Rules of Bankruptcy Procedure,

---

**8.** Even if the court had concluded that Roth had not waived his right to complain about costs on appeal, the court would not have considered his arguments that Mims waived his right to seek costs as they were not presented to the bankruptcy court. On appeal, Roth argues the following: (1) that Mims failed to include a request for costs in the Amended Joint Pretrial Order (which displaced previous pleadings); (2) that Mims failed to request costs at trial or to even provide any evidence relating to costs at trial; (3) that Roth failed to request amendment of the amended and final judgment within the time prescribed by Fed. R. Bankr.P. 8002; and (4) that Mims failed to file its request within a reasonable time. Below, Roth only argued that Mims was not entitled to costs because he failed to: (1) confer with opposing counsel as required by local rules and the motion was considered *ex parte;* and (2) request a hearing. Moreover, Roth's argument in his Motion to Dismiss Trustee's Amended Complaint that the trustee's request for attorney's fees and costs was premature, because Rule 54(d) "requires that litigants seek fees and costs by motion only after judgment has been entered," is totally inconsistent with what he now urges on appeal.

the clerk of the court is directed to prepare, sign and enter judgment upon receipt of and in accordance with this Memorandum Opinion and Order. All allowable and reasonable costs shall be taxed against Appellant Anthony G. Roth.